ROBERT H. ROTSTEIN (SBN 72452),
rxr@msk.com
ELAINE K. KIM (SBN 242066),
ekk@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, California 90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Defendants,
Lightstorm Entertainment, Inc. and
James Cameron

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

GERALD MORAWSKI,

Plaintiff,

v.

LIGHTSTORM ENTERTAINMENT, INC., a California corporation; JAMES CAMERON, an individual; and DOES 1 through 10,

Defendants.

CASE NO. CV11-10294 MMM (JCGx)

Hon. Margaret M. Morrow

**NOTICE OF MOTION AND MOTION OF DEFENDANTS LIGHTSTORM ENTERTAINMENT, INC. AND JAMES CAMERON FOR SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

[Supporting Declarations; Statement of Undisputed Facts and Conclusions of Law; and [Proposed] Judgment filed concurrently herewith]

Time: 10:00 a.m.
Date: January 14, 2013
Ctrm.: 780

Trial Date: March 12, 2013
Time: 8:30 a.m.

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on January 14, 2013, at 10:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 780, located at 255 East Temple Street, Los Angeles, CA 90012-3332, Defendants Lightstorm Entertainment, Inc. ("LEI") and James Cameron ("Cameron") (collectively, "Defendants") will and hereby do move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order dismissing in their favor Plaintiff Gerald Morawski's First Amended Complaint in its entirety or, in the alternative, for summary adjudication.

This motion is made following conference of counsel pursuant to L.R. 7-3 which took place on August 7 and 8, 2012. The parties were unable to reach a resolution to eliminate the necessity of a hearing.

This motion is made on the following grounds:

**<u>First Claim for Relief for Breach of Express Contract</u>**

1. Plaintiff's first claim for breach of express contract fails as a matter of law because, based on the undisputed facts, Defendants independently created *Avatar*.

2. Plaintiff's claim for breach of express contract fails as a matter of law because, based on the undisputed facts, the story idea that Plaintiff pitched, "Guardians of Eden" ("*GoE*"), is not substantially similar in idea to *Avatar*.

3. Plaintiff's claim for breach of express contract fails as a matter of law because, based on the undisputed facts, Plaintiff did not provide any original ideas that were used in *Avatar*.

4. Plaintiff's claim for breach of express contract fails as a matter of law because, based on the undisputed facts, the claim is barred by the four-year statute of limitations.

**Second and Third Claims for Relief for Breach of Implied-in-Fact Contract**

1. Plaintiff's second claim for breach of implied-in-fact contract (against LEI and Cameron) and third claim for breach of implied-in-fact contract (against Cameron) fail as a matter of law because there cannot be an implied-in-fact contract where there is an express contract regarding the same subject matter, and even if there could be, the express contract contradicts Plaintiff's allegations regarding any implied-in-fact contract.

2. Plaintiff's claims for breach of implied-in-fact contract fail as a matter of law because, based on the undisputed facts, Defendants independently created *Avatar*.

3. Plaintiff's claims for breach of implied-in-fact contract fail as a matter of law because, based on the undisputed facts, *GoE* is not substantially similar in idea to *Avatar*.

4. Plaintiff's claims for breach of implied-in-fact contract fail as a matter of law because, based on the undisputed facts, the claims are barred by the two-year statute of limitations.

**Fourth and Fifth Claims for Relief for Fraud**

1. Plaintiff's fourth claim for fraud (against LEI and Cameron) and fifth claim for fraud (against Cameron) fail as a matter of law because, based on the undisputed facts, Plaintiff cannot prove that Defendants intended to defraud Plaintiff. As a matter of law, Plaintiff cannot prove such intent based on the existence of an alleged breach of contract alone.

2. Plaintiff's claims for fraud fail as a matter of law because, based on the undisputed facts, Defendants independently created *Avatar*.

3. Plaintiff's claims for fraud fail as a matter of law because, based on the undisputed facts, Plaintiff did not provide any original ideas that were used in *Avatar*.

4. Plaintiff's claims for fraud fail as a matter of law because, based on the undisputed facts, *GoE* is not substantially similar in idea to *Avatar*.

5. Plaintiff's claims for fraud fail as a matter of law because Plaintiff cannot prove that he suffered any reliance damages.

6. As Plaintiff cannot prove any claim for fraud, his prayer for punitive damages should be summarily dismissed.

**Sixth and Seventh Claims for Relief for Negligent Misrepresentation**

1. Plaintiff's sixth claim for negligent misrepresentation (against LEI and Cameron) and seventh claim for negligent misrepresentation (against Cameron) fail as a matter of law because Plaintiff's claims are based on alleged false promises regarding future conduct. There is no cause of action for negligent false promise under California law.

2. Plaintiff's claims for negligent misrepresentation fail as a matter of law because, based on the undisputed facts, Defendants independently created *Avatar*.

3. Plaintiff's claims for negligent misrepresentation fail as a matter of law because, based on the undisputed facts, Plaintiff did not provide any original ideas that were used in *Avatar*.

4. Plaintiff's claims for negligent misrepresentation fail as a matter of law because, based on the undisputed facts, *GoE* is not substantially similar in idea to *Avatar*.

5. Plaintiff's claims for negligent misrepresentation fail as a matter of law because Plaintiff cannot prove that he suffered any reliance damages.

//

//

//

//

For the foregoing reasons as well as the reasons discussed in the attached Memorandum of Point and Authorities, Defendants' motion for summary judgment should be granted, and judgment entered in Defendants' favor.

DATED: November 9, 2012

MITCHELL SILBERBERG & KNUPP LLP

By: /s/ Robert H. Rotstein
Robert H. Rotstein

Attorneys for Defendants,
Lightstorm Entertainment, Inc. and
James Cameron

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. STATEMENT OF UNDISPUTED FACTS ........ 1

A. *Defendants'* Avatar ........ 1

B. *Plaintiff's* Guardians Of Eden ........ 4

1. The Written Agreement And Plaintiff's *GoE* Pitch ........ 4

2. Plaintiff's Pitch As Reflected In The Salient Documents ........ 5

3. Plaintiff's Additional Claims As To What He Pitched ........ *7*

III. PLAINTIFF'S CONTRACT CLAIMS FAIL ........ 9

A. *Cameron Independently Created* Avatar. ........ 9

B. GoE *And* Avatar *Are Not Substantially Similar* ........ 14

C. *The Implied-In-Fact Contract Claims Fail Because The Express Contract Covers The Same Subject Matter.* ........ 20

D. *Plaintiff's Breach Of Express Contract Claim Fails Because The Ideas Allegedly Used In Avatar Are Not "Original."* ........ 20

E. *Plaintiff's Contract Claims Are Time-Barred.* ........ 23

IV. PLAINTIFF'S FRAUD AND MISREPRESENTATION CLAIMS FAIL ........ 25

V. CONCLUSION ........ 25

# TABLE OF AUTHORITIES

## CASES

*A Slice of Pie Prods., LLC v. Wayans Brothers Entm't*,
487 F. Supp. 2d 41 (D. Conn. 2007) .......... 17, 19

*Benay v. Warner Bros. Entm't, Inc.*,
607 F.3d 620 (9th Cir. 2010) .......... 15, 22, 24

*Bethea v. Burnett*,
No. CV04-7690, 2005 WL 1720631 (C.D. Cal. June 28, 2005) .......... 9

*Bissoon-Dath v. Sony Computer Entm't Am., Inc.*,
694 F. Supp. 2d 1071 (N.D. Cal. 2010) .......... 20

*Cachil Dehe Band of Wintun Indians of Colusa-Indian Cmty. v. California*,
618 F.3d 1066 (9th Cir. 2010) .......... 20

*Cavalier v. Random House, Inc.*,
297 F.3d 815 (9th Cir. 2002) .......... 20

*Conrad v. Bank of Am.*,
45 Cal. App. 4th 133 (1996) .......... 25

*Davies v. Krasna*,
14 Cal. 3d 502 (1975) .......... 24

*Dielsi v. Falk*,
916 F. Supp. 985 (C.D. Cal. 1996) .......... 25

*Green v. Schwarzenegger*,
No. CV 93-5893, 1995 WL 874191 (C.D. Cal. July 12, 1995) .......... 15, 22

*Henried v. Four Star Television*,
266 Cal. App. 2d 435 (1968) .......... 18

*Hogan v. DC Comics*,
48 F. Supp. 2d 298 (S.D.N.Y. 1999) .......... 9

*Hollywood Screentest of Am., Inc. v. NBC Universal, Inc.*,
151 Cal. App. 4th 631 (2007) .......... 9, 14

*Kienzle v. Capital Cities/Am. Broad. Co.*,
774 F. Supp. 432 (E.D. Mich. 1991) .......... 23

*Kightlinger v. White*,
No. B210802, 2009 WL 4022193
(Cal. App. 2d Dist. Nov. 23, 2009) (unpublished) ............................9, 14, 15, 18

*Kimbell v. Rock*,
No. CV 09-7249, 2009 WL 3248208 (C.D. Cal. Oct. 8, 2009) .........................16

*Klekas v. EMI Films*,
150 Cal. App. 3d 1102 (1984) .......................................................16, 17, 18, 19

*Lance Camper Mf'g. Corp. v. Republic Indem. Co. of Am.*,
44 Cal. App. 4th 194 (1996) ...........................................................................20

*Lazar v. Sup. Ct.*,
12 Cal. 4th 631 (1996) ....................................................................................25

*Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*,
361 F.3d 312 (6th Cir. 2004) ..........................................................................16

*Neel v. Magana, Olney, Levy, Cathcart & Gelfand*,
6 Cal. 3d 176 (1971) .......................................................................................24

*Netbula, LLC v. Bindview Dev. Corp.*,
516 F. Supp. 2d 1137 (N.D. Cal. 2007)...........................................................25

*Reginald v. New Line Cinema Corp.*,
No. B190025, 2008 WL 588932 (Cal. Ct. App. Mar. 5, 2008)
(unpublished) .............................................................................................15, 17

*Reichert v. Gen. Ins. Co. of Am.*,
68 Cal. 2d 822 (1968) .....................................................................................24

*Serv. by Medallion, Inc. v. Clorox Co.*,
44 Cal. App. 4th 1807 (1996)..........................................................................25

*Sutton v. Walt Disney Prods.*,
118 Cal. App. 2d 598 (1953) .....................................................................15, 19

*Tarmann v. State Farm Mut. Auto. Ins. Co.*,
2 Cal. App. 4th 153 (1991) .............................................................................25

*Teich v. Gen. Mills*,
170 Cal. App. 2d 791 (1959) .....................................................................10, 14

*Tenzer v. Superscope, Inc.*,
39 Cal. 3d 18 (1985) .......... 25

*Thompson v. Cal. Brewing Co.*,
191 Cal. App. 2d 506 (1961) .......... 24

*Wall-Noon Corp. v. Hill*,
45 Cal. App. 3d 605 (1975) .......... 20

*Weitzenkorn v. Lesser*,
40 Cal. 2d 778 (1953) .......... 15

*Wolf v. Walt Disney Pictures & Tel.*,
162 Cal. App. 4th 1107 (2008) .......... 21

**STATUTES**

California Civil Code
§ 1644 .......... 21

California Code of Civil Procedure
§ 337(1) .......... 23
§ 339(1) .......... 24

**OTHER AUTHORITIES**

3 B.E. Witkin, *Cal. Procedure*, Actions
§ 520 (5th ed. 2008) .......... 24

4 Nimmer on Copyright
§ 19D.06[B][1] .......... 21

# I. INTRODUCTION

In this lawsuit for breach of express and implied-in-fact contract, promissory fraud, and negligent misrepresentation, Plaintiff Gerald Morawski makes the baseless assertion that in creating the blockbuster movie *Avatar*, Defendants James Cameron and his production company, Lightstorm Entertainment, Inc. ("LEI"), used Plaintiff's story idea "Guardians of Eden" ("*GoE*"), which he pitched to Defendants in 1991. The undisputed evidence mandates summary judgment for Defendants on several independent grounds.

First, overwhelming evidence establishes that Cameron, one of the most successful writers and directors in history, created *Avatar* independently, primarily based on his own works that predate *GoE*. The incontrovertible evidence of independent creation defeats all claims. Second, Plaintiff's claims of use fail because *Avatar* and *GoE* are not substantially similar. Third, the parties' written contract provided only that if Defendants wished to acquire Plaintiff's *original* ideas, they would negotiate therefor; the ideas on which Plaintiff bases his claim are not original. Fourth, the claims for breach of implied contract fail because the express agreement covers the same subject matter. Fifth, the contract claims are time-barred. Lastly, Plaintiff cannot show fraud, and California does not recognize a claim for negligent false promise.

# II. STATEMENT OF UNDISPUTED FACTS

## A. *Defendants'* Avatar

*Avatar* is an award-winning science-fiction film that premiered on December 10, 2009. SUF¶1. Decades before *Avatar* was written, Cameron, an artist, science enthusiast, and avid science-fiction fan since his teens, began writing and drawing works that explored the ideas, themes, and images that ultimately appeared in the movie. SUF¶¶14-143. *See infra*, §III.A. In 1995, Cameron wrote a lengthy "scriptment" for *Avatar*. SUF¶12. In 1996, copies were sent to Twentieth Century Fox Film Corporation ("Fox"). SUF¶213. The project did not go forward at that

time, however, because technology was not sufficiently developed to produce the film in the way Cameron wanted. SUF¶214. In 2005, Defendants began to re-explore whether the technology had sufficiently progressed to make *Avatar*. SUF¶216. In December 2005, LEI transferred to Fox all rights in the *Avatar* project, including in the scriptment. SUF¶217. Beginning in or about late 2005 and continuing through about April 2006, Cameron wrote the first draft of the script for *Avatar*. SUF¶218. In January 2007, Fox announced that it had green-lit production of the film. SUF¶¶225,226.

*Avatar* is set largely in 2154 A.D. on Pandora, a distant moon on which two groups live: (i) humans affiliated with the Resources Development Administration (RDA) (and its "Sec-Ops" security force), which mines "unobtanium," used on Earth as an energy source; and (ii) the Na'vi, ten-foot tall, blue-skinned, long-tailed, preternaturally strong humanoids indigenous to Pandora. "Avatars" are genetically engineered hybrid bodies that look like Na'vi, but that humans control via a mental link. Avatars are used to interact with the Na'vi. SUF¶2.

Jake Sully, a 22-year-old paraplegic ex-marine, learns that his late twin-brother Tom was an avatar operator. RDA offers Tom's job to Jake to salvage the millions spent on Tom's DNA-specific avatar. Jake accepts RDA's substantial monetary offer and travels to Pandora. Upon arriving, he meets Colonel Miles Quaritch, an imposing man with a scarred face; Dr. Grace Augustine, the irascible middle-aged head of the Avatar Program; and others. Jake begins training and joyfully discovers that through his avatar, he can walk again. Meanwhile, Quaritch offers him a secret deal: if Jake provides intelligence on the Na'vi, he will get an expensive surgery to restore his legs once back on Earth. SUF¶3.

Jake initiates his avatar and explores the Na'vi forest, but gets separated from his colleagues while fleeing from ferocious alien animals. As night falls, a Na'vi named Neytiri spots him. She is about to shoot him with an arrow when a "woodsprite" (a cross between a snowflake and a jellyfish) floats down and lands

on her arrowhead. Puzzled, she lowers her bow. Later, she saves Jake by reluctantly killing alien viperwolves that attack him. She chastises Jake for forcing her to kill these creatures and leaves. Jake follows her, and a swarm of woodsprites alight on his body. He tries to bat them away, but Neytiri stops him, telling him that they are pure spirits from the sacred Tree of Souls. Neytiri brings Jake back to her clan's home in a gigantic tree, known as "Hometree."[1] SUF¶4.

When in his avatar form, Jake lives with the Na'vi and takes on the arduous challenges of a young Na'vi warrior. Meanwhile, after delinking from his avatar, Jake reports to Quaritch and RDA's administrator, Parker Selfridge. Selfridge tells Jake that Hometree sits atop one of Pandora's most extensive unobtanium deposits. Jake is given three months to persuade the clan to relocate peacefully. As Jake proves himself through Na'vi tests, Neytiri begins to trust him, and they fall in love. Jake becomes torn between his promise to provide anti-Na'vi information so he can walk again, on the one hand, and his growing love for Neytiri and the Na'vi, on the other. When Jake passes all of the Na'vi tests, he is initiated into the clan. Jake and Neytiri choose each other as life-long mates. SUF¶6.

Over the course of the film, Jake's allegiance switches to the Na'vi. Selfridge and Quaritch make a plan to destroy Hometree. When Jake tells the Na'vi of the pending attack, they become angry at him and decide to attack the advancing Sec-Ops forces. They are defeated and Hometree is destroyed. The clan retreats to the Tree of Souls. Jake and Grace become Quaritch's prisoners, but manage to escape with the help of a Sec-Ops pilot. Grace is wounded, however, and although the Na'vi try to resuscitate her in a ritual, she dies. SUF¶7.

To convince the Na'vi that he can be trusted, Jake tames a legendary flying

[1] Other members of Neytiri's clan are her father Eytukan, the clan chief; her mother Mo'at, the clan's spiritual leader who interprets the will of the Na'vi deity, Eywa; and Tsu'tey, a young male warrior designated to be the next clan chief and Neytiri's mate. Eytukan initially wants to kill Jake, but changes his mind when he learns that Jake is a warrior who might have information about the alien humans. Mo'at orders Neytiri to teach Jake the Na'vi ways. SUF¶5.

creature called a "Toruk." Riding the Toruk, Jake recruits thousands of warriors from neighboring Na'vi clans to go to war. The Na'vi fight bravely, but are on the verge of final defeat when the Pandoran wildlife join the fight and attack Sec-Ops soldiers. Jake in his avatar squares off with Quaritch in a robotic AMP (Amplified Mobility Platform) suit. During the fight, Jake's human body is exposed to the Pandoran air, and he nearly dies. Neytiri comes to Jake's aid and kills Quaritch. In the final scene, the Na'vi perform a ritual on Jake at the Tree of Souls, permanently transferring him into his avatar. SUF¶8.

**B. *Plaintiff's* Guardians of Eden**

**1. The Written Agreement and Plaintiff's *GoE* Pitch**

[REDACTED] SUF¶144. In 1991, Cameron became interested in Plaintiff's artwork and bought four pieces from him. SUF¶¶149-50.[2] Plaintiff, though not a writer, saw this as an opportunity to try to develop and pitch a story idea to Defendants. SUF¶¶165-66,173. On December 4, 1991, Plaintiff signed a contract ("Agreement"), which states in part:

> All Material and other information furnished by Lightstorm to you, *as well as any ideas and responses furnished by you*, shall be the sole and exclusive property of Lightstorm, which may freely exploit same in any manner or kind, without any restriction whatsoever and without payment or any other obligation or liability to you…. Notwithstanding the foregoing, Lightstorm shall not own, and you shall retain as your exclusive property, all *original* ideas and artwork created by you which are not derived from Lightstorm's Material, and should Lightstorm wish to acquire your property, the parties will negotiate therefor. SUF¶¶158,159 (emphases added).

[2] Cameron also later loaned money to Plaintiff, who needed money for living expenses. SUF¶164.

Mitchell Silberberg & Knupp LLP

Plaintiff alleges that later that day, he pitched *GoE* to LEI's Anne Damato and Cameron, and then to Cameron again on December 9, 1991. SUF¶170. Later in December 1991, LEI's then-President called Plaintiff and told him that LEI could not do a development option on *GoE*, and that the only way anything could progress would be if Plaintiff submitted a screenplay. SUF¶204. Plaintiff never wrote a screenplay for *GoE*. SUF¶205.

**2. Plaintiff's Pitch as Reflected in the Salient Documents**

Three contemporaneous documents reflect Plaintiff's 1991 pitch to Defendants. First, Anne Damato memorialized Plaintiff's December 4 pitch in a two-page memo ("Pitch Notes").[3] SUF¶174. Second, Plaintiff provided to LEI an eight-page "Conceptual Summary" of *GoE* in December 1991 ("Conceptual Summary"). SUF¶¶190-92. Third, in late December 1991, Plaintiff wrote a letter to filmmaker Ron Fricke, pitching *GoE* and describing the story idea ("Fricke Letter"). SUF¶¶207-08. The consistent story reflected in the Pitch Notes, the Conceptual Summary, and the Fricke Letter is not in any way the story of *Avatar*.

As reflected in these documents, *GoE* is a present-day adventure story set on Earth, in the Central or South American jungle. A crop of specialized plants react strangely during a solar eclipse, and begin emitting a mind-altering perfume that affects good and bad people differently. A Shaman lives in the jungle with his wife and 16 year-old son (also shamans). The Shaman has learned the plants' secret and has been using the perfume to enhance his awareness. Two researchers, who also know the plants' secret, are mysteriously killed in a plane crash. Their daughters, Eve and Serena, continue their parents' research. Serena slept with Eve's husband, causing Eve's divorce. SUF¶¶177-81.

Eve pilots a plane to a remote jungle by a lake to research the plant life.

---

[3] [redacted]

SUF¶182. The area has near-vertical cliffs, and magnetic forces [redacted] . SUF¶¶199-200. A lightning bolt enters Eve's plane and locks onto her silver hair piece. As she narrowly avoids a crash, she encounters the Shaman, and her plane picks up all sorts of strange readings coming off the plants. She returns to the research base, leaving her hair piece. SUF¶182.

That evening, the Shaman and his son sit by a campfire and, after smelling plant perfume, have strange visions of a dragon coming out of the fire. As they depart for bed, each has different dream experiences. In his dream, the son heads to Eve's boathouse, where he enters her room, but gets strange vibrations coming from the shaman masks on the walls, which protect Eve. The son goes to Serena's room, and the two share a sexual experience. The Shaman dream-travels to a nearby village that is being destroyed by mercenaries. SUF¶183. [redacted]

Eve flies to her research headquarters near the Miami Keys, where she tests the plant life. After smelling the plant perfume, Eve is transported to the Shaman and learns that he helped her parents with plant research and that her parents were also shamans. SUF¶¶184-85. [redacted] SUF¶202. Eve is then visited by a character named LK, who had helped Eve's parents get financing from big corporations and wanted to offer his regrets. Eve has always had a crush on LK and decides to act upon it. As they are about to have sex, Serena phones Eve and reveals that their parents had discovered something important and that their findings are stored on fax machines worldwide. Eve tells LK that she must go to the jungle; he promises to meet her there. SUF¶186.

Eve arrives at the lake to find her house on fire, with Serena handcuffed to the bedposts inside. Eve pulls the bed through the wall and into the water, where

the sisters reconcile. When Eve surfaces, the shaman masks come alive and help save Serena, who is taken to the hospital as Eve journeys to the lake. SUF¶187.

At the lake, Eve and the Shaman fight the mercenaries, who break the plants, unleashing perfume that kills them by causing them to face their deadly demons. The lone survivor backs Eve and the Shaman off a cliff; the Shaman sacrifices himself to save Eve. LK appears and shoots the mercenary, but Eve soon learns that he killed her parents and attacked Serena. Eve uses the plant perfume on LK, and as he struggles with his demons, she flees for her plane where she finds the Shaman's son. Even the demons cannot stop LK, who gets on top of the plane and crashes through the window, but Eve ultimately vaporizes him. In the end, Eve, Serena, and the Shaman's son load the plants onto the plane and take off for home, discussing how to use the plants for mass distribution. SUF¶¶188-89.

**3. Plaintiff's Additional Claims as to What He Pitched**

Plaintiff's characterization of *GoE* in his pleadings differs radically from the Pitch Notes, Conceptual Summary, and Fricke Letter.[4] Many of the elements on which he bases his claims are not present in these contemporaneous documents. So, to avoid this problem, Plaintiff alleges that he orally provided *other* story elements to Defendants that are contained in his so-called "pre-pitch" handwritten notes.[5] SUF¶236. [redacted] SUF¶¶238-39. [redacted]

---

[4] [redacted] SUF¶175. [redacted] SUF¶191. [redacted] and claimed that the Conceptual Summary was just a writing sample—even though it precisely corresponds to the Pitch Notes. SUF¶191-92. While Plaintiff did not provide the Fricke Letter to Defendants in 1991, it is consistent with the Pitch Notes and Conceptual Summary, and like them, markedly dissimilar to *Avatar*. SUF¶208.

[5] Plaintiff has said under oath that all of the elements he pitched are contained in the Conceptual Summary, Fricke Letter, and his "pre-pitch" handwritten notes. SUF¶236.

Mitchell Silberberg & Knupp LLP



[redacted]

In any event, Defendants assume, for the purposes of this motion for summary judgment only, that Plaintiff pitched other story elements contained in his "pre-pitch" notes that were not in the Pitch Notes, Conceptual Summary, or Fricke Letter. Under that assumption, here is the story that he now claims to have pitched: Ray, a military vet [redacted], who travels to the jungle. SUF¶¶259-60. [redacted] SUF¶263. [redacted] SUF¶¶257,264. [redacted] SUF¶269. [redacted] *Id.* [redacted] SUF¶274.[6] [redacted] SUF¶277. There is a vast neural plant mind that is aware of what is threatening it in other areas. SUF¶250. The story then inexplicably lurches forward more than sixteen years, because the "veteran" turns out to be the Shaman, and the story proceeds as described above in §B.2., except: (i) [redacted] SUF¶271,281; (ii) the mercenaries are working for mining interests, SUF¶ 242; and (iii) [redacted]

---

[6] At his deposition, [redacted] SUF¶275.

Mitchell Silberberg & Knupp LLP

SUF¶316.[7] Again, even fully crediting Plaintiff's sworn interrogatory responses as to the content of his 1991 pitch, Defendants are entitled to summary judgment.

## III. PLAINTIFF'S CONTRACT CLAIMS FAIL

### A. *Cameron Independently Created* Avatar.

It is well established under California law that where a defendant's work is created independently of plaintiff's idea, plaintiff's claim for breach of contract necessarily fails because undisputed evidence of independent creation precludes a finding that the idea was used. *Hollywood Screentest of Am., Inc. v. NBC Universal, Inc.*, 151 Cal. App. 4th 631, 648 (2007) (where there is uncontroverted evidence of defendant's independent creation, alleged similarities and timing of plaintiff's submission do not create a triable issue of fact). Thus, summary judgment is mandated where, as here, the defendant presents extensive, well-documented, and uncontroverted evidence that defendant independently derived the ideas at issue from his or her own prior works or from other sources besides the plaintiff's—even where plaintiff's work was submitted before the creation of defendant's work.[8] *Id.* at 648. *Accord Teich v. Gen. Mills*, 170 Cal. App. 2d 791,

---

[7] Plaintiff's "pre-pitch" notes contain one page, [REDACTED] that says that certain tribe members can merge consciousness with animals. SUF¶288. However, there is nothing in Plaintiff's notes indicating how that element fits into the story of *GoE*. SUF¶289.

[8] *See Kightlinger v. White*, No. B210802, 2009 WL 4022193, at *10 (Cal. App. 2d Dist. Nov. 23, 2009) (unpublished) (plaintiff claimed that the defendant breached an implied-in-fact contract by using his idea in a movie; defendant admitted reading plaintiff's script before writing his own; *held* summary judgment for defendant affirmed where defendant established that based his script on events from his own life and on ideas provided by others). *See also Bethea v. Burnett*, No. CV04-7690, 2005 WL 1720631, at *15-*16 (C.D. Cal. June 28, 2005) (copyright defendants conceded that the plaintiff had pitched ideas to Burnett's associate before Burnett conceived of *The Apprentice*, and that the associate worked with Burnett on developing *The Apprentice*; nevertheless, the court granted summary judgment on independent creation where Burnett testified that he conceived the idea while watching a documentary about people competing for a job and saw *The Apprentice* as an adaptation of his prior show *Survivor*); *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 310, 314 (S.D.N.Y. 1999) (summary judgment on independent creation where the defendant creator had previously authored a novel featuring a half-vampire, half-human character, which served as an inspiration for her Nicholas Gaunt character and graphic novel).

803-05 (1959) (affirming judgment for defendant as a matter of law in an idea case on ground that, notwithstanding the degree of similarity between the two works, defendant's substantial evidence of independent creation was uncontroverted).

Plaintiff claims that his oral pitch and *Avatar* share a number of similarities. For the record, his list of alleged similarities mischaracterizes both *GoE* and *Avatar*. Declaration of Michael Robert Gale, Ex. 1 ("Gale Report") at 47-65. Indeed, many of the purportedly similar elements do not even appear in *Avatar*. *See infra*, nn. 9-18. But even assuming *arguendo* that Plaintiff had properly characterized *GoE* and *Avatar*, the incontrovertible evidence establishes that Cameron based *Avatar* on his own works created long before he met Plaintiff.

*Avatar* is Cameron's "most personal film." SUF¶14. In his declaration, he meticulously describes how he created *Avatar*, tracing its origins directly to his own life experiences and his prior work, including drawings, stories, and films he created beginning in the 1970s. Cameron explored the themes, plot elements, and character-types in *Avatar* long before Plaintiff pitched *GoE*.

Plaintiff claims that *Avatar* and *GoE* have the following similarities (the "Alleged Similarities"): (1) a rainforest or jungle environment; (2) a planet that has a collective spirituality and a neural network of plants or vast plant mind, and plants with valuable healing properties[9]; (3) mountains with near-vertical cliffs; (4) electromagnetic forces that disable electronic equipment; (5) a protagonist is an ailing military veteran who travels to the jungle[10]; (6) he sees glowing plants and unusual animals; (7) he meets an indigenous woman; (8) he is seen as a "chosen one" or a good person by glowing pollen around his head or on his body[11]; (9) he is

[9] The Tree of Souls does not have valuable healing properties, and plants with valuable healing properties are not a story point in *Avatar*. SUF¶¶248,253.

[10] In *Avatar*, Jake is paralyzed, and he does not go to Pandora to seek a cure for it. His human body is never healed. SUF¶¶265,278.

[11] Jake's encounter with the woodsprites does not mark him as a "chosen one"; before he rides the Toruk in the third act of the film, the Na'vi treat him with animosity and suspicion. SUF¶276.

healed in some way; (10) he marries the indigenous woman and becomes a tribal shaman and leader[12]; (11) characters have the ability to transport their consciousness in a second form, while their body is in a dreamlike state[13]; (12) the tribe lives in harmony with nature; (13) certain tribe members have the ability to merge their consciousness with animals[14]; (14) another protagonist is a capable and determined female scientist/botanist who has corporate sponsors, and is an advocate of the environment and the tribe[15]; (15) antagonists who are evil mining interests that want to exploit the tribal forest for a mineral and eliminate the tribe members[16], and that are callous toward the environment; (16) an army of murderous mercenaries that work for the corporation and a villain who leads the mercenaries; (17) air that only good characters can breathe, and that is harmful to the mercenaries[17]; (18) a fight between the protagonists and the mercenaries[18]; and (19) a victory by the protagonists over the mercenaries, despite their technologically superior weaponry such as helicopter gunships, and death of the mercenary commander. SUF¶¶240-317. The following summarizes the uncontroverted evidence of independent creation of each Alleged Similarity:

***Xenogenesis* (1977-79):** Cameron based much of *Avatar* on his work from *Xenogenesis*, which contained: (i) a sentient planet covered by a forest containing a network of willow-like trees with a brain coral floor of overgrown roots and

---

[12] Jake does not become a tribal shaman and does not become a leader until he rides the Toruk. SUF¶283.

[13] The avatar process is pure technology and bio-genetics. An operator of a remotely controlled avatar is not dreaming; the mind is fully conscious and is receiving sensory input from an outside source. SUF¶286.

[14] Tribe members do not actually use this ability in the story of *GoE*. Plaintiff does not allege that in *GoE*, tribe members can physically connect their nerve endings with those of animals. SUF¶289.

[15] Grace is directly employed by RDA and heads its Avatar Program. SUF¶293.

[16] In *Avatar*, RDA seeks to have the tribe relocate. ¶299.

[17] The air on Pandora is toxic to all humans, including Jake and Grace. SUF¶303.

[18] [redacted] In *Avatar*, Grace dies before the final battle. SUF¶¶310,312.

Mitchell Silberberg & Knupp LLP

glowing, motile tendrils nearly identical to the Tree of Souls in *Avatar*; (ii) a setting of steep mesa cliffs; (iii) a scene in which the characters explore the jungle at night, and see glowing plants and alien animals virtually the same as those in *Avatar*; (iv) a scene in which small creatures with gently swaying filaments that resemble a "glowing dandelion seed" form a glowing swarm around the male character, who tries to bat them away, but is stopped by the female character; (v) a race of genetically engineered, blue-skinned humanoids on another planet, like the Na'vi in *Avatar*; (vi) air that humans cannot breathe. SUF¶¶22-63,127. Cameron conceived the idea of the Na'vi being able to physically connect the living tendrils in their queues or "hair" with those of animals, based on the concept of willow-like trees with motile tendrils in *Xenogenesis*. SUF¶91. *Xenogenesis* is the antecedent to Alleged Similarities 1, 2, 3, 6, 8, 13, and 17, above.

***Chrysalis* (1973-74):** In this Cameron project, a wheelchair-bound man mind-travels to an alien forest of giant trees and is able to walk, made whole by his transcendental journey—a clear antecedent to Jake in *Avatar* and to Alleged Similarities 9 and 11. SUF¶¶20-21,111.

***Mother* (1980-81):** In this Cameron project, humans have plundered Earth and look to mine another planet or moon through the efforts of an international and interplanetary consortium called Triworld Development Corporation (the "Company"). This parallels the RDA in *Avatar* and its mining of unobtanium. Because of the planet's extremely high temperatures and toxic atmosphere, humans cannot survive without environment suits. A "xenomorph"—a genetically engineered alien creature—is created based on a local life form in order to serve the needs of the Company. These genetically engineered aliens could be used as workers in the mines and are controlled via a "psychic link w/ an 'adept'" or an "electronic link w/ a trained controller," which Cameron combined in *Avatar*. In *Mother*, one of the Company's research and development stations is run by a female senior operator, who was the controller of the xenomorph prototype and has

a lab staff. This character is a prototype of Grace in *Avatar*. And, one of the controllers is crippled. SUF¶¶65-70. This work constitutes incontrovertible evidence of independent creation regarding Jake and Alleged Similarities 11, 14, 15, and 17.

***Wind Warriors* (1980s); *Aliens* (1986); *Rambo II* (1983):** Cameron further explored the themes of colonization and related motifs in these works, including antagonists that are callous corporate interests backed up by a military force. In Cameron's treatment for an unproduced work called *Wind Warriors*, an industrialist with a private army exploits a tribe in the Amazon jungle in a quest for a valuable alien metal[19]; after the protagonists, including a military veteran and a scientist who is interested in the tribe's plants, destroy the industrialist's airship, a shaman calls upon the tribe to rise up against the mercenaries, who are forced to withdraw. SUF¶87. Cameron's *Aliens* concerned a conflict between aliens and a corporation backed up by "Colonial Marines" that seek to obtain alien samples to make biological weapons. SUF¶71. The Carter Burke character in *Aliens*—a corporate wimp who double-crosses the protagonist—was a direct prototype for the character of *Avatar*'s Selfridge, the RDA representative who commands Sec-Ops, many of whom are former Marines. SUF¶72. *Aliens* starred Sigourney Weaver as Ripley, the archetypal strong female engineer and adventurer in science fiction movies. SUF¶71. In Cameron's *Rambo II* screenplay, a Vietnam veteran returns to the Southeast Asian jungle, falls in love with a local girl, and ultimately fights against the U.S. military. SUF¶77. These works constitute incontrovertible evidence of independent creation regarding Alleged Similarities 4, 5, 7, 14, 15, 16, 18, and 19.

---

[19] In *Avatar*, the alien metal that RDA seeks is unobtanium, a room-temperature superconductor, an idea that Cameron conceived in the 1970s. SUF¶103. It naturally followed that mountains filled with a room-temperature superconductor and suspended in extremely powerful electromagnetic fields would interfere with aircraft navigation systems. SUF¶105.

***The Abyss* (1989):** In Cameron's film *The Abyss*, Lindsey Brigman is a brilliant female engineer who helps stop Navy Seals from detonating a nuclear weapon in the ocean to destroy peaceful aliens.[20] SUF¶¶79-81,135. Lieutenant Coffee is the prototype for Quaritch in *Avatar*, the out-of-control military leader who confronts the hero in single combat. SUF¶80. *The Abyss* shows independent creation as to Alleged Similarities 14, 16, 18, and 19.

**Colonial History, Pocahontas, *Dances with Wolves* (1990), Other Antecedents:** One of *Avatar*'s themes derives from the genocide committed by Europeans against indigenous peoples of North and South America in the early colonial period, told through the lens of a Romeo-and-Juliet love story between two individuals on either side of the conflict. It is the famous story of Pocahontas or *Dances with Wolves* (1990), set in the future on an alien planet. SUF¶¶108-09,115. And, Cameron's brother was a Marine in the Gulf War, also inspiring the Jake character. SUF¶112. Cameron independently created Alleged Similarities 5, 7, 10, and 12.

In sum, the evidence of independent creation is "'clear, positive, uncontradicted and of such a nature that it cannot rationally be disbelieved.'" *Kightlinger*, 2009 WL 4022193, at *10 (quoting *Teich,* 170 Cal. App. 2d at 799). Defendants are entitled to summary judgment on this basis alone.

**B. GoE *and* Avatar *Are Not Substantially Similar*.**

To prove breach of contract, the plaintiff must prove that the defendant "used" his idea. *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 631-32 (9th Cir. 2010). To raise an inference of actual use (rebuttable by evidence of the

[20] Lindsey is infused with excitement as she describes the alien beings she has discovered living in the deep. This is a precursor to *Avatar*, in which Grace attempts to convince the skeptics about the existence of the alien intelligence Eywa. SUF¶135. *See also* ***Terminator 2***, in which scientist Miles Dyson works for the corporation responsible for the creation of the neural-net computer that will destroy Earth, and sacrifices himself in an attempt to save the world. SUF¶84.

Mitchell Silberberg & Knupp LLP

defendant's independent creation), the plaintiff must show not only access but also substantial similarity between his idea and the defendant's work. *Id.*; *Sutton v. Walt Disney Prods.*, 118 Cal. App. 2d 598, 603 (1953). The Court may determine lack of substantial similarity as a matter of law. *Weitzenkorn v. Lesser*, 40 Cal. 2d 778, 791 (1953). A court considers the plots, sequences, characters, settings, dramatic gimmicks, and themes of the defendant's work and the plaintiff's idea. *See Benay*, 607 F.3d at 632. "[T]he degree of similarity required to meet the substantial similarity standard is high in the idea submission context." *Reginald v. New Line Cinema Corp.*, No. B190025, 2008 WL 588932, at *5-*6 (Cal. Ct. App. Mar. 5, 2008) (unpublished) (citing cases); *see Kightlinger*, 2009 WL 4022193, at *3 (same).[21] Plaintiff cannot satisfy this standard because *Avatar* and *GoE* are not substantially similar in idea at all, much less in *original* (*i.e.*, novel) idea as required by the Agreement, *see* §D, *infra*.[22]

Initially, allegedly similar elements in *GoE* that Cameron *previously created* must be filtered out. *See Green v. Schwarzenegger*, No. CV 93-5893, 1995 WL 874191, at *23 (C.D. Cal. July 12, 1995) (granting summary judgment to Cameron on an implied-in-fact contract claim involving *Terminator 2* where, as here, Cameron had conceived of the main elements at issue in connection with films that predated the plaintiff's submission). *See also Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 326 (6th Cir. 2004) (elements in the defendant's prior work must be "filtered out" before analyzing copying of

---

[21] For example, in *Benay*, the Ninth Circuit found a triable issue of fact as to substantial similarity of idea between a movie and a screenplay, both titled *The Last Samurai*, where: "[I]n both works, the protagonist [wa]s an embittered American war veteran who travels to Japan where he meets the Emperor, trains the Imperial Army in modern warfare, fights against the samurai, and in the end is spiritually restored. Both works [we]re set at the time of the Satsuma Rebellion of 1877; both works rel[ied] heavily on the historical figure Saigo Takamori; and both works share[d] the same title." 607 F.3d at 632.

[22] To be actionable, *use* in a breach of implied-in-fact contract claim can be based on substantial similarity of unprotected ideas. But actionable use in an *express* contract claim depends on the parties' agreement. *Benay*, 607 F.3d at 631.

Mitchell Silberberg & Knupp LLP

plaintiff's copyrighted work because "where an element occurs both in the defendant's prior work and the plaintiff's prior work, no inference of copying can be drawn"); *Kimbell v. Rock*, No. CV 09-7249, 2009 WL 3248208, at *3 (C.D. Cal. Oct. 8, 2009) (same). After such filtration, the primary purported similarities that remain are that an outsider with a military background encounters and joins a tribe, marries a tribal woman, and becomes a leader—a classic motif that appears in many pre-1991 works, including *Dances With Wolves*.[23] These elements as a matter of law do not give rise to substantial similarity. *See Klekas v. EMI Films*, 150 Cal. App. 3d 1102, 1112-15 (1984) (plaintiff's idea not substantially similar to *Deer Hunter* despite both being stories about military veterans returning home from war and becoming romantically involved with women they left behind).

Second, even without the requisite filtration, *GoE* and *Avatar* are not substantially similar under the applicable analysis:

***Plot.*** In *Avatar*, Jake controls an avatar, falls in love with his target, and turns on RDA. *GoE* is the quest of a heroine to solve a professional and a family mystery, which puts her in conflict with a love interest who is later unmasked as the villain. These ideas are substantially different. There are no avatars in *GoE*; there is no family mystery in *Avatar*. Nor are the works substantially similar because they contain the generic elements of an indigenous population in conflict with ruthless exploiters.[24] *See Klekas*, 150 Cal. App. 3d at 1112-15; *A Slice of Pie*

[23] The other remaining alleged similarities are that some tribe members have the ability to merge their consciousness with animals, and electromagnetic forces in the area disable electronic equipment. One page of Plaintiff's "pre-pitch" handwritten notes [REDACTED] mentions the [REDACTED] SUF¶257. The Flux Vortex in *Avatar* [REDACTED] SUF¶258. In any event, these immaterial elements do not make *Avatar* and *GoE* substantially similar in idea, nor are they original. SUF¶¶318-24; Gale Report at 50-51, 58, 188, 190.

[24] A work involving ten-foot tall blue aliens on flying pterodactyls who attack enemy troops in AMP suits is not substantially similar to a work about a shaman

(…continued)

Mitchell Silberberg & Knupp LLP

*Prods., LLC v. Wayans Brothers Entm't*, 487 F. Supp. 2d 41, 49, 52 (D. Conn. 2007) (applying California law: no substantial similarity in plot between works about police officers pretending to be from different ethnic backgrounds to solve crimes); *Reginald*, 2008 WL 588932, at *8 (handbook about crashing weddings not substantially similar to *Wedding Crashers* despite 14 alleged similarities; "most of the similarities plaintiff points out are ideas or situations that would be common to any two works that included a wedding crashing sequence"). SUF¶318.[25]

***Sequence.*** The sequences of events in *Avatar* and *GoE* are radically different. Although both involve some travel to a rainforest followed by successful resistance against mercenaries, the remaining events occur in different orders. In *GoE*, the Shaman arrives in the forest and is cured, and then the action jumps ahead 17 years and involves Eve and her travails. In contrast, *Avatar* is the story of how Jake becomes a Na'vi. That both works end with battles does not make the sequences substantially similar in idea. *See Slice of Pie*, 487 F. Supp. at 49 (sequence of going undercover before fighting criminals and achieving a happy ending was not unique enough to create substantial similarity). SUF¶319.

***Dramatic Gimmicks.*** In *GoE*, the plant perfume triggers dream travel and hallucination scenes that are central to the story, including the psychic sex scene

(…continued)
who repels the mercenaries with the aid of plant perfume that induces demonic hallucinations. Plaintiff claims that the scene in *GoE* in which Ray is seen as a chosen one because of [redacted] pollen is similar to the scene in *Avatar* where woodsprites alight on Jake. SUF¶273. However, the woodsprites do not mark Jake as a "chosen one" to the Na'vi, who treat him with disrespect and suspicion for much of the story (until he rides the Toruk). Nor do they show that he is good because he otherwise would have been killed by the air. Neytiri is the one who is about to kill Jake when the woodsprites stop her. SUF¶¶4,276,303. In any event, as discussed in §A *supra*, the woodsprites scene comes from Cameron's early work *Xenogenesis* (1970s), and must be filtered out of the substantial similarity analysis.

[25] Plaintiff also asserts that *Avatar* and *GoE* are similar because the planet helps defeat the antagonists in battle. In *GoE*, the protagonists use the plant perfume, which causes deadly hallucinations to help defeat the mercenaries, while in *Avatar*, armies of Pandoran animals join the fight against RDA. SUF¶¶306-08. The plants in *Avatar* are victims, not combatants. Again, these ideas differ markedly.

between the Shaman's son and Serena, the Shaman revealing himself to Eve, and demons killing mercenaries. Nothing similar occurs in *Avatar*. SUF¶320.

***Characters.*** The characters in *GoE* and *Avatar* are not substantially similar. SUF¶321. Plaintiff compares Jake (*Avatar*) with the Shaman or Ray (*GoE*). Jake is a paraplegic former Marine who travels to Pandora for money. He is a brash and cocky loner, and agrees to engage in counter-espionage. In contrast, the Shaman in *GoE* [redacted] but never in any of the publicly communicated writings) is not paralyzed; [redacted] He does not go to the Amazon for money or with the mercenaries. He is strong, wise, and knowledgeable in most of the story. That both characters are, in a general sense, ailing veterans does not make them substantially similar. *See Klekas*, 150 Cal. App. 3d at 1113 n.7 (no substantial similarity where "[i]n each work the protagonist is a meditative man who is returning home from military service"); *Henried v. Four Star Television*, 266 Cal. App. 2d 435, 436-37 (1968) (no substantial similarity where protagonists were both rich and rode in chauffeur-driven Rolls Royces).

Neither are Neytiri (*Avatar*) and the Shaman's wife Maya (*GoE*) similar. Neytiri is a young, ten-foot tall, strong-willed, blue-skinned alien. Maya is human and for much of the story is married with a teenage son (and old enough to be Neytiri's mother). Maya is ill-defined, and certainly not substantially similar to Neytiri.

Plaintiff next compares Grace (*Avatar*) with Eve (*GoE*). Grace is middle-aged, with a dominating, cynical personality and evidently no romantic life. Eve is a naïve young scientist trying to complete the plant research started by her parents. She has a strained relationship with her sister and almost has a tryst with LK. That the characters are both female and both scientists doesn't make them substantially similar. *See Kightlinger*, 2009 WL 4022193, at *4-*9 (no substantial similarity in

Mitchell Silberberg & Knupp LLP

idea where both works were set in animal sanctuaries and veterinarian offices and involved female protagonists who sought to rescue animals).

Plaintiff compares Quaritch (*Avatar*) with LK (*GoE*). Quaritch, a former marine, is a bloodthirsty supremacist who hates scientists and has a vendetta against Jake and the Na'vi. LK is charming and conniving. He does not know the Shaman and is apparently motivated solely by greed. He also has a love interest of sorts in Eve; Quaritch has no romance.

***Setting.*** *Avatar* takes place in the future, on an imaginary moon located in another star system with an atmosphere lethal to humans.[26] *GoE* is set on Earth in present-day South America.[27] SUF¶322. These settings differ markedly.

***Theme.*** While both *Avatar* and *GoE* involve environmental issues, such broad similarity is not *substantial*. *E.g.*, *Slice of Pie*, 487 F. Supp. 2d at 48 ("while both works touch on racial issues and satirize elements of popular culture, the difference in is the details"); *Klekas*, 150 Cal. App. 3d at 1113 ("[T]here are a limited number of ideas and themes available for use in literary material, and, therefore, those ideas and themes are shared by all literature.").[28]

***Combination.*** Plaintiff claims that *Avatar* contains a "combination of ideas" from *GoE*. But because *GoE* and *Avatar* are dissimilar under the appropriate

---

[26] Although in *GoE*, the mercenaries wear gas masks in the jungle, this is presumably because the plant perfume causes them to have deadly hallucinations. Good humans can breathe normally.

[27] Plaintiff claims that both works are set in a rainforest with some glowing plants and strange animals, with steep cliffs and magnetic anomalies. However, in *GoE*, the entire South American jungle does not light up at night; in the Conceptual Summary, [redacted] SUF¶201. And, South American jungles contain exotic animals. Pandora, in contrast, is home to alien creatures unlike anything one would encounter in the Amazon. *See Sutton*, 118 Cal. App. 2d at 603 (no substantial similarity between "a fantasy of animals, reptiles, amphibians and insects endowed with intellectual attributes" and "a real-life portrayal of animals"). In *Avatar*, the mountains literally float; nothing similar is in *GoE*. And in *Avatar*, the nearby planet has a strong magnetic field, but it does not [redacted] SUF¶258.

[28] Central themes in *Avatar* are not in *GoE*, including the failure of colonialism. SUF¶¶92-94.

substantial similarity analysis, combining dissimilar elements cannot magically create substantial similarity. Moreover, lists of random, decontextualized similarities are inherently unreliable. *Cavalier v. Random House, Inc.*, 297 F.3d 815, 825 (9th Cir. 2002).[29] Rather, for substantial similarity to exist, the elements must be combined in the same way. *See Bissoon-Dath v. Sony Computer Entm't Am., Inc.,* 694 F. Supp. 2d 1071, 1091 (N.D. Cal. 2010) ("the sequences of elements, and the relationships between them, are entirely dissimilar"). That is not the case here. SUF¶¶324-29.

**C. *The Alleged Express and Implied Contracts Overlap***

"[A]n action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter." *Lance Camper Mf'g. Corp. v. Republic Indem. Co. of Am.*, 44 Cal. App. 4th 194, 203 (1996). *Accord Wall-Noon Corp. v. Hill*, 45 Cal. App. 3d 605, 613 (1975). Plaintiff admits that the Agreement is valid, and so he has no viable implied-in-fact contract claim. SUF¶¶158-61. For this reason, too, the implied-in-fact contract claims fail.

**D. *Plaintiff's Breach of Express Contract Claim Fails Because the Ideas Allegedly Used in* Avatar *Are Not "Original."***

"The interpretation of a contract is a judicial function." *Cachil Dehe Band of Wintun Indians of Colusa-Indian Cmty. v. California*, 618 F.3d 1066, 1073 (9th Cir. 2010). "When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law . . . even when conflicting inferences may be drawn from the undisputed extrinsic evidence . . . or that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation."

---

[29] Although *Cavalier* is a copyright infringement case, the principle necessarily applies in an idea submission case. Even dissimilar, highly abstract ideas can be made to sound similar by listing random similarities. *See* Gale Report at 34, 47 (*Wizard of Oz* and the science fiction comedy *Back to the Future* can be made to sound similar; as can *Avatar* and *Goldilocks and the Three Bears*).

Mitchell Silberberg & Knupp LLP

*Wolf v. Walt Disney Pictures & Tel.*, 162 Cal. App. 4th 1107, 1126 (2008). Here, because no material conflict in the extrinsic evidence exists, it is within the Court's purview to interpret the Agreement.

Under the Agreement, Plaintiff expressly disclaimed everything except "*original* ideas and artwork created by [him]." SUF¶159 (emphasis added). Under California law, the words of a contract are to be understood in their ordinary and popular sense. Cal. Civ. Code §1644. In its ordinary sense, "original" means "new; fresh; inventive; novel." *Random House Webster's Unabridged Dictionary* 1366 (2001). So, Defendants were obligated to negotiate with Plaintiff if they wished to acquire *novel* ideas. "'[N]ovel' ideas are those that are *new*, in the sense that they are not already being used in the industry for which they are proposed." 4 *Nimmer* on Copyright §19D.06[B][1] (2012) (emphasis in original); *see Random House Webster's Unabridged Dictionary* at 1327 ("novel" means "of a new kind; different from anything seen or known before").

As Plaintiff concedes, and as discussed in the concurrently submitted report of Defendants' expert witness Michael Robert (Bob) Gale, none of the Alleged Similarities is, individually, original. SUF¶324. Rather, Plaintiff contends that a "combination" of elements from *GoE* was original and that that combination was used in *Avatar*. SUF¶325. The argument lacks merit, both because Plaintiff's self-defined combination is not a coherent story idea at all, and because almost all of the elements in his self-defined list are contained in Cameron's own prior works and in third-party works that predate *GoE*.

First, Plaintiff self-defines the "original idea" that Defendants allegedly used as a purported combination of only those elements from GoE that he contends also appear in *Avatar*. That cherry-picked list is not original (*i.e.*, novel). It ignores the rest—and indeed, the dramatic core—of *GoE*, omitting the key elements of the plant perfume that enables good people to dream travel and causes fatal hallucinations in bad people (the defining idea in *GoE*); the conflict between the

sisters; the mysterious deaths of their parents; and Eve's romantic interest in the true villain. SUF¶¶326-29. None of these elements is in *Avatar*. Plaintiff's contrived list is simply not the story idea that Plaintiff pitched; indeed, it is not a story idea at all or even a coherent "combination." It follows from this alone that Defendants' purported use of the elements that Plaintiff identifies as his so-called "combination" could not, under the Agreement, constitute use of Plaintiff's original idea. *See Benay*, 607 F.3d at 631 (what constitutes actionable use in a case involving an express contract depends on parties' agreement).

Moreover, as noted in §A above, long before Plaintiff submitted *GoE* to Defendants, Cameron himself created numerous works that combined many of the same elements on which Plaintiff bases his claim. The Agreement in this case required negotiation only if Defendants wished to acquire Plaintiff's *original* ideas; not surprisingly, it did *not* require Defendants to negotiate for what was already theirs. For this reason as well, Cameron's prior work must thus be filtered out of the analysis of the use of Plaintiff's "original ideas." The absence of novelty in what remains is manifest. *See supra*, §B at 16 & n.23 (discussing the few generic elements that remain after filtering out Cameron's pre-existing work). There "is no evidence of similarities of novel ideas sufficient to allow a reasonable finder of fact to conclude that defendants 'used'" *GoE*. *Green*, 1995 WL 874191, at *23 (after elements in Cameron's prior works were filtered out, "consideration of the works themselves demonstrates that there is no evidence of similarity other than of general ideas that have been previously used in countless motion pictures").

Finally, Plaintiff cannot prove originality in his so-called "combination" of Alleged Similarities because numerous third-party works predating *GoE* also combine a significant number of these same elements. SUF¶¶329-33,142,196,197; *see* Gale Report at 66-82.[30] Most notably, Alan Dean Foster's novel *Midworld*

30 [redacted] SUF¶193.

Mitchell Silberberg & Knupp LLP

(1975) contains nearly all of the elements in Plaintiff's "combination" (and many other elements in *GoE* that Plaintiff does not contend are in *Avatar*). In *Midworld*, an indigenous tribe member fights mercenaries who want to exploit his planet. Like *GoE*, *Midworld* takes place in a jungle; high places and steep drops dominate the landscape; there are bioluminescent plants and a vast neural network; some plants give off a deadly pollen or perfume; some plants distinguish friend from foe; glowing creatures that flit and hover over the characters; the indigenous tribe is human; the protagonist, a warrior, is alone in the forest at night at the beginning of the story; there is a female scientist who has corporate sponsors, whom the protagonist first encounters when her aircraft is about to crash in the jungle; there is a shaman; the indigenous protagonist saves the female scientist's life; the evil corporation seeks a mysterious substance that has great value to mankind; the evil corporation has no concern for the environment and does not care if it destroys it in carrying out its objectives; a paramilitary group works for the evil corporation, headed by a merciless paramilitary leader; with the help of plants (and animals), the protagonist defeats the invaders, who have advanced weaponry and far greater fire power; the indigenous population can bond with animals. SUF¶330.[31]

In sum, the elements on which Plaintiff relies are not original.

**E. *Plaintiff's Contract Claims Are Time-Barred.***

Plaintiff's express contract claim is barred by the four-year statute of limitations. *See* Cal. Civ. Proc. Code §337(1). The claim accrues at the time of the breach, *Reichert v. Gen. Ins. Co. of Am.*, 68 Cal. 2d 822, 831 (1968), and the

---

[31] In *Midworld*, the protagonist is not an outsider. The mere presence of an outsider in *GoE* does not make Plaintiff's purported combination of elements original. That element is present in countless stories exploring colonialism, including *At Play in the Fields of the Lord*. SUF¶196. Merely adding pre-existing elements together does not create originality. *See Kienzle v. Capital Cities/Am. Broad. Co.*, 774 F. Supp. 432, 438 n.13 (E.D. Mich. 1991) (treatment that "incorporated a Barney Miller style television comedy series" and "several priests who work at an inner-city rectory and interact with members of the community" was not novel because "[a] proposal for a television series is not novel if it merely incorporates two pre-existing ideas").

statute of limitations "begins to run at that time regardless of whether any damage is apparent or whether the injured party is aware of his or her right to sue." 3 B.E. Witkin, *Cal. Procedure*, Actions §520 (5th ed. 2008); *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal. 3d 176, 187 (1971). The Agreement stated that "should Lightstorm wish to acquire [Plaintiff's] property, the parties will negotiate therefor." SUF¶159. Cameron wrote the scriptment for *Avatar* in 1995; it contains every element in the film on which Plaintiff bases his claim. SUF¶¶12, 241. Assuming that Plaintiff's claim could survive summary judgment on other grounds (and it cannot), Defendants would have been obligated, at the latest, to negotiate with Plaintiff before LEI transferred the rights in *Avatar* (including the scriptment) to Fox on December 5, 2005. SUF¶217. Thus, the four-year statute of limitations ran no later than December 5, 2009, two years before Plaintiff filed this lawsuit.

Plaintiff's implied-in-fact contract claims are barred by the two-year statute of limitations. *See* Cal. Civ. Proc. Code §339(1). Such a claim accrues upon use. *Thompson v. Cal. Brewing Co.*, 191 Cal. App. 2d 506, 509 (1961) (accrual on alleged use of marketing ideas as a test in two cities); *see Davies v. Krasna*, 14 Cal. 3d 502, 511-12 (1975) (accrual upon "sale or exploitation of the idea"). "[I]n the absence of any reason to hold otherwise," "courts generally assume that the accrual date is the date on which the work is released to the general public" as it is unclear what use the parties intended would trigger defendant's obligation to pay. *Benay*, 607 F.3d at 633. But here, Plaintiff has acknowledged that Defendants' alleged obligation to pay was triggered *before* release of the film. In a document that he signed on November 4, 2009, and which was subsequently filed in a lawsuit in Wisconsin, Plaintiff represented that Defendants had already become obligated to pay him "[f]or use of concepts delivered to Director James Cameron and being

used in the 20th Century Fox motion picture AVATAR." SUF¶234.[32] Plaintiff filed suit more than two years later. His implied contract claims are time-barred.

## IV. PLAINTIFF'S FRAUD AND MISREPRESENTATION CLAIMS FAIL

Plaintiff's promissory fraud and negligent misrepresentation claims fail for the reasons above. And, to prevail on a promissory fraud claim, "it must be shown that the promisor did not intend to perform at the time the promise was made." *Conrad v. Bank of Am.*, 45 Cal. App. 4th 133, 157 (1996). No such evidence exists. *See Netbula, LLC v. Bindview Dev. Corp.*, 516 F. Supp. 2d 1137, 1157 (N.D. Cal. 2007) ("Affirmative evidence is necessary to avoid summary judgment because mere nonperformance is not enough to show intent to defraud."); *Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 30 (1985). Nor can Plaintiff show damages proximately resulting from any reliance on the alleged promissory fraud—Plaintiff had 18 years to sell *GoE* before *Avatar* was released, yet pitched it only to Ron Fricke in 1991 and never wrote a screenplay. SUF¶¶204-12; *Lazar v. Sup. Ct.*, 12 Cal. 4th 631, 638 (1996); *Serv. by Medallion, Inc. v. Clorox Co.*, 44 Cal. App. 4th 1807, 1818 (1996) (damages must arise out of fraud, not breach).

Plaintiff's negligent misrepresentation claims allege that in the Agreement, Defendants promised not to use his original ideas, without reasonably believing that they would not do so. SUF¶163. California does not recognize such a claim. *Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal. App. 4th 153, 158-59 (1991); *Dielsi v. Falk*, 916 F. Supp. 985, 995 n.13 (C.D. Cal. 1996) (idea submission case).

## V. CONCLUSION

Defendants respectfully submit that summary judgment is appropriate.

DATED: November 9, 2012

MITCHELL SILBERBERG & KNUPP LLP
By: _/s/ Robert H. Rotstein__________
Attorneys for Defendants

---

32 Plaintiff did not produce the November 4, 2009 document in this litigation. Defendants found it in the court files of the Wisconsin case.