1 | BROWNE GEORGE ROSS LLP
Peter W. Ross (State Bar No. 109741)
2 |  pross@bgrfirm.com
Peter Shimamoto (State Bar No. 123422)
3 |  pshimamoto@bgrfirm.com
2121 Avenue of the Stars, Suite 2400
4 | Los Angeles, California 90067
Telephone: (310) 274-7100
5 | Facsimile: (310) 275-5697

6 | Attorneys for Plaintiff Gerald Morawski

7 |

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10 |

| | |
|---|---|
| GERALD MORAWSKI, | Case No. CV-11-10294 MMM (JCGx) |
| Plaintiff, | The Hon.  Margaret M. Morrow |
| vs. | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| LIGHTSTORM ENTERTAINMENT, INC., JAMES CAMERON and DOES 1 through 10, | |
| Defendants. | **[REDACTED]** |
| | [Supporting Declarations; Statement of Genuine Issues of Material Fact in Response to Defendants' Undisputed Facts and Conclusion of Law filed concurrently herewith] |
| | Judge:  Hon. Margaret M. Morrow |
| | Date:  January 14, 2013 |
| | Time:  10:00 a.m. |
| | Crtrm.: 780 |
| | Trial Date:  March 12, 2013 |
| | Time:  8:30 a.m. |
| | Ctrm.:  780 |

350726.1

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION.................................................................................. 1

II.  STATEMENT OF FACTS................................................................... 2

    A.  Plaintiff's Contacts With Defendants ....................................... 2

    B.  The Non-Disclosure Agreement. ................................................ 2

    C.  The Pitch Meetings. .................................................................. 3

    D.  Defendants Offer Plaintiff A Deal For *GOE* ........................... 8

    E.  Cameron Begins Working on *Avatar*........................................ 9

III.  ARGUMENT ..................................................................................... 10

    A.  *Guardians Of Eden* Is Original .............................................. 10

    B.  Defendants' Substantial Similarity Argument Fails............................. 13

    C.  Defendants' "Independent Creation" Argument Lacks Merit.............. 21

    D.  Plaintiff Can Assert Both Express And Implied Contract Claims........ 23

    E.  Plaintiff's Contract Claims Are Not Barred By The Statute Of Limitations ........................................................................ 23

    F.  Plaintiff's Fraud Claim Should Not Be Dismissed............................. 24

-i-

# **TABLE OF AUTHORITIES**

**Page**

## **CASES**

*April Enterprises, Inc. v. KTTV,*
147 Cal. App.3d 805 (1983).................................................................24

*Benay v. Warner Bros. Entertainment, Inc.,*
607 F.3d 620 (9th Cir. 2010).........................................14, 18, 21, 23

*Buchwald v. Paramount Pictures Corp.,*
13 U.S.P.Q.2d 1497 (1990)....................................................13, 14, 15

*Donahue v. United Artists Corp.,*
2 Cal. App.2d 794 (1970)..................................................................23

*Federal National Mortgage Ass'n v. Bugna,*
57 Cal. App.4th 529 (1997).................................................................11

*Fink v. Goodson-Todman Enterprises, Inc.,*
9 Cal. App.3d 996 (1970)....................................................11, 13, 14, 15

*Golding v. R.K.O. Pictures, Inc.,*
35 Cal.2d 690 (1950)................................................................11, 13

*Goldwater v. Oltman,*
210 Cal. 408 (1930)............................................................................23

*Gryczman v. 4550 Pico Partners, Ltd.,*
107 Cal. App.4th 1 (2003)..................................................................24

In *Green v. Schwarzenegger,*
1995 WL 874191 (C.D Cal. July 12, 1995)........................................19

*In re De Laurentis Entertainment Group, Inc.,*
963 F.2d 1269 (9th Cir. 1992).............................................................23

*Kightlinger v. White,*
2009 WL 4022193 (Cal. App. 2d Dist. Nov. 23, 2009)......................13

*Kimbell v. Rock,*
2009 WL 3248208 (C.D. Cal. Oct. 8, 2009)......................................19

*Klekas v. EMI Films, Inc.,*
150 Cal. App.3d 1102 (1984)............................................................13

*Mayhew v. Benninghoff,*
53 Cal. App.4th 1365 (1997)..............................................................11

*Minniear v. Tors,*
266 Cal. App.2d 495 (1968)...............................................................15

350726.1

*Murray Hill Publications, Inc. v. Twentieth Century Fox Film Corp.,*
    361 F.3d 312 (6th Cir. 2004) ................................................................. 19

*Patriot Rail Corp. v. Sierra Railroad Co.,*
    2011 WL 318400 (E.D. Cal. Feb. 1, 2011) ....................................... 25

*Reginald v. New Line Cinema Corp.,*
    2008 WL 588932 (Cal. Ct. App. Mar. 5, 2008) .............................. 13

*Stanley v. Columbia Broadcasting System, Inc.,*
    35 Cal.2d 653 (1950) ................................................................. 13, 15

*Tenzer v. Superscope, Inc.,*
    39 Cal.3d 18 (1985) ............................................................................ 25

*Weitzenkorn v. Lesser,*
    40 Cal.2d 778 (1953) ....................................................... 12, 13, 15

**OTHER AUTHORITIES**

M. Nimmer, *Nimmer on Copyright,*
    §2.01[A], at p.2-9 ................................................................. 12, 14

Cal. Rules Court
    §8.1115 ............................................................................................. 13

## I. **INTRODUCTION**.

Defendants' contention that *Guardians of Eden* ("*GOE*") is not "original" fails for numerous reasons.  The fact that Defendants offered Plaintiff a deal for *GOE* demonstrates that Defendants believed *GOE* was original.  Moreover, Defendants' own witnesses have testified that they believe the story in *Avatar* is original.  Since *Avatar* is based on *GOE*, the story in *GOE* is necessarily also original.  Moreover, Defendants have failed to identify any other prior work that has the same combination of characters, plot, themes and sequence of events as *GOE*.  *GOE* is also original because it is the result of Plaintiff's own creation and is not based on any other works.  Defendants therefore cannot obtain summary judgment with respect to originality.

Defendants' contention that *Avatar* is not substantially similar to *GOE* also fails.  Among other things, Defendants apply the wrong legal standard.  In a contract case under California law, the issue of similarity is determined by evaluating the works as a whole from the viewpoint of the reasonable, average individual, and not through the dissection of the work into individual micro-elements by an expert.  Moreover, where, as here, there is no dispute as to access, the level of similarity required is lower.  In any event, a comparison of the two works demonstrates that the essential themes, plots, structure and primary characters are virtually identical, let alone similar.  ████████████████████████████████████████ ███████████████████████████████████████████ █████████████  Defendants therefore are not entitled to summary judgment on substantial similarity.

Finally, Defendants' independent creation argument fails.  Defendants allege that *Avatar* was independently created because isolated elements in certain of Defendants' prior works are purportedly also in *Avatar*.  However, Defendants concede that those prior works are nothing like *Avatar*.  Moreover, the prior works upon which Defendants rely were created in the 1970s and 1980s, but have never

1    been produced.  In Plaintiff's view, it is no coincidence that, even though those
2    alleged prior works had been in existence for ten or twenty years, Cameron did not
3    write the scriptment for *Avatar* until a few years <u>after</u> Plaintiff pitched *GOE* to
4    Defendants.  In addition, if Defendants had in fact already created works that were
5    similar to *GOE*, they would have stopped Plaintiff's pitch once the alleged similarity
6    became apparent, and would not have offered Plaintiff a deal for *GOE.*

7         Defendants' motion therefore should be denied.

8    **II.    STATEMENT OF FACTS.**

9         **A.    Plaintiff's Contacts With Defendants**

10        On or about October 24, 1991, Plaintiff met with Cameron at Lighstorm's
11   offices.  Plaintiff showed Cameron a portfolio of his "Visionary Light Art images,"
12   which is art that transcends the physical world and portrays spiritual or mystical
13   themes, and whose main media of expression is light.  (Morawski Decl. ¶4)
14   Cameron's reaction to Plaintiff's artwork was very favorable.  Cameron stated that
15   he might want Plaintiff' to work on a film project Cameron was developing called
16   *Burning Chrome.  (Id.* ¶6)  On October 29, 1991, Cameron paid Plaintiff $4,000 for
17   the right to reproduce four of Plaintiff's images for Cameron's art gallery.
18   (Morawski Decl. ¶7, Ex. A)  Plaintiff's artwork was subsequently displayed on the
19   walls of Lightstorm's offices.  (Morawski  Decl. ¶8)

20        Plaintiff asked Cameron if he would be willing to consider a motion picture
21   project Plaintiff was developing.  Cameron agreed to take a pitch meeting.
22   (Morawski Decl. ¶9)

23        **B.    The Non-Disclosure Agreement.**

24        Prior to the initial pitch meeting, Defendants sent Plaintiff Defendants' form
25   Confidentiality and Non-Disclosure Agreement ("NDA").  (Morawski Decl. Ex. B)
26   Defendants' counsel (and subsequently COO), Matt Saver, was the person who had
27   drafted Defendants' form NDA.  (Shimamoto Decl. Ex. A [Saver Tr. 19:4-15,
28   20:17-22])  Plaintiff refused to sign the version sent by Saver, because it only

1  provided protection for material disclosed by Defendants to Plaintiff, and not for

2  material Plaintiff disclosed to Defendants.  (Morawski Decl. ¶11)  Plaintiff

3  expressed his concerns to Saver, and Saver sent a revised version of the agreement.

4  (*Id.* ¶¶11-12)  That version added the following terms:

> Notwithstanding the foregoing, Lightstorm shall not own, and you shall
>
> retain as your exclusive property, all original ideas and artwork created
>
> by you which are not derived from Lightstorm's Material, and should
>
> Lightstorm wish to acquire your property, the parties will negotiate
>
> therefor.

10  (*Id.* ¶12 and Ex. C)  Plaintiff signed the revised version on December 4, 1991.

11  Alexandra Drobac, who was Lightstorm's office manager and Cameron's Executive

12  Assistant, also signed the NDA.  (Morawski Decl. ¶14, Ex. D)

### C.    **The Pitch Meetings.**

14  After signing the agreement, Plaintiff had two pitch meetings with

15  Defendants.  (Morawski Decl. ¶18; Shimamoto Decl. Ex. E, ███████████

16  ████)  Each meeting lasted more than an hour.  (Morawski Decl. ¶18)  The first

17  meeting was on December 4, 1991.  Cameron and a Lightstorm creative executive,

18  Anne Damato, were present.  At the end, Cameron asked Morawski to return for a

19  second meeting.  (Morawski Decl. ¶18)  The second pitch meeting was on

20  December 9.  Only Cameron was present at the second pitch meeting.  (*Id.*)

21  *GOE*, as pitched by Plaintiff to Defendants, told the story of an epic struggle

22  between an evil mining conglomerate, that would destroy the planet to satisfy its

23  greed, and an indigenous tribe that lives at one with, and protects, its rainforest

24  environment.  *GOE* was set in South America, in the Amazon basin.  During the

25  pitch, Cameron asked if the story had to occur in that location.  ███████████

26  █████████████████████████████████████████████

27  █████████████

28  The main characters of *GOE* are as follows:

- **Ray.** The story's hero, who emerged from Plaintiff's own military background, is a military veteran named Ray, who is suffering from a debilitating illness as a result of exposure to toxic chemicals. He travels to the rainforest because he has heard that it contains plants that have healing properties.

- **Eve.** Eve is a female scientist, who specializes in the biochemistry and medicinal properties of plants. She is the head of a scientific research institute that is funded by corporate sponsors. Eve is the daughter of two scientists, who had been researching the healing properties of plants in the rainforest. She has come to the rainforest to carry on her parents' research. Her parents had recently died, under mysterious circumstances, apparently on the verge of a major scientific discovery about the rainforest. Eve is capable, determined, and a strong advocate for both the environment and the indigenous peoples. Eve has a younger sister, Serena, who accompanies her on her research expedition.

- **Maya.** Maya is the daughter of a tribal leader -- a tribal princess. She lives in tune with nature, knows its ways, knows the valuable and beneficial properties of plants, and is a capable warrior.

- **LK.** LK is the antagonist. He is a tough, capable, military veteran, who leads an army of murderous mercenaries. Their goal is to carry out the will of the evil mining conglomerate. That goal is to eliminate the indigenous people and clear the way for the mining company to mine valuable minerals (called "fullerenes") from the rainforest. LK and the mining interests are indifferent to the beneficial properties of the unusual plant life in the rainforest and callous towards the environment.

- **The Planet.** One of the most unusual aspects of the story is that the

planet itself is a protagonist.  It has a collective consciousness and spirituality, which manifests itself in the plant life.  The plant life forms a vast neural plant mind, aware of what is happening in different parts of the planet.  The plants themselves are the "Guardians of Eden".  They have mutated.  They have unusual properties.  Some plants glow.  They are capable of producing chemicals that protect the planet and help defeat the forces of evil.

The basic plot elements, told in chronological order, are as follows:

- The hero, Ray, flies over the jungle in a small, private plane.  His instruments go awry, due to strange, magnetic forces.  He is compelled to parachute into the rainforest.  That night he finds himself alone in the forest.  He sees many strange phenomena -- unusual insects and animals, and plants that glow.  He is bewildered by his environment.  He is found by Maya, a tribal chieftain's daughter.  She is prepared to leave him there, but he is marked as a "chosen one" by bio-luminescent tree seeds that light up around his head and on his body.  Maya takes him back to the tribal council, where he becomes one of the few outsiders accepted into their society.

- Maya becomes Ray's guide in the ways of the tribe and the forest.  He is taught the healing properties of the local plant life.  His body heals, and he becomes stronger.

- The tribe members are able to "dream travel".  An individual falls into a trance or dreamlike state and his/her consciousness travels to another location, while the physical body remains in place.  The individual can assume a physical form (a "second body" or "doppelganger") in the other location.  Ray gains the ability to dream travel.

- The tribe members, who live in complete harmony with nature, are able to merge their consciousness with animals, become one with them, and

control the animals' actions. Ray learns to do so as well.

- As Ray matures and becomes knowledgeable in the ways of the tribe and nature, he and Maya fall in love. Ray becomes recognized as a great tribal shaman. He and Maya have a child together.

- But all is not well in this Eden. Ray dream travels to a part of the rainforest where LK and his mercenary army are at work. Ray sees the mercenaries attacking a native village. The mercenaries' helicopter hovers over the village, while soldiers on the ground systematically kill the villagers. Ray is outraged and saddened by the slaughter.

- Meanwhile, Eve, the strong-willed and environmentally conscious scientist, arrives at the rainforest, accompanied by her sister. She encounters Ray. Some sort of telepathic connection is established between them.

- Eve studies the plants she has gathered. She discovers that they contain unique properties. Conditions in the rainforest have caused the plants to evolve in a way that protects the planet. Among other things, they emit compounds that cleanse the area of the pollutants that have invaded it. Eve also discovers that the plants are mentally and spiritually connected.

- In addition, the plants have unique effects on people who encounter them. People who are good at heart experience positive effects, such as enhanced creativity, understanding, insights and powers. The plants "cleanse" the person's body of toxins and allow him to realize his full potential. The plants themselves give these people the ability to travel telepathically through space and materialize as "doubles" somewhere else, and take on other forms.

- The plants have harmful effects on individuals who are evil and have a bad intent. The plants release chemicals that cause the evildoer to

350726.1

-6-

1   experience hallucinations and believe that his worst fears have come
2   true.  These people must wear oxygen masks to survive when they enter
3   the rainforest.

4   •   Because Ray, Eve and the tribe members are good, they receive the
5       benefits of the rainforest's atmosphere, and do not need to wear any
6       equipment to protect themselves from it.  The mercenaries, on the other
7       hand, must wear oxygen masks.

8   •   LK attacks Eve's sister, Serena, in her cabin.  He handcuffs her to her
9       bed, sets the cabin on fire and leaves.  Eve returns and rescues Serena
10      from the fire.

11  •   Ray visits Eve.  He persuades her to join him in the fight against the
12      mercenaries.  She agrees.  She learns how to dream travel.

13  •   LK leads his team of mercenaries in a massive attack on the tribe, with
14      the intent of eliminating the tribe, so the mining company can have free
15      access to the minerals.  The mercenaries have advanced weaponry,
16      helicopters, machine guns, rockets, flame-throwers.  They attack both
17      on the ground and in helicopter gunships.

18  •   Ray, Maya, and Eve lead the tribe's counterattack.  The tribe members
19      have only rudimentary weapons, such as bows and arrows.  However,
20      joined by the planet itself, its spirit and vast neural network, the
21      guardian plants and the animals, the tribe fights back.

22  •   After LK's helicopter is forced to the ground, Ray and Maya personally
23      engage LK in battle.  Ray ultimately kills LK.

24  (Morawski Decl. Ex. E [Plaintiff's Response to Lightstorm's Interrogatory No. 1];
25  ███████████████████████████████████ )

26      The above description of *GOE* is confirmed, not only by Plaintiff's testimony
27  and the notes he wrote during that period (Kim Decl. Exs. 24, 25), ███████████
28  ████████████████████████████████████████████████████████████

350726.1                                   -7-

1  ████████████████████████████████

2       It is critical to note that no one involved in this case remembers the actual

3  movie pitch, except Plaintiff.  Only three people heard any of the pitch – Plaintiff,

4  Cameron and Damato.  Cameron does not remember the pitch.  ████████████

5  ██████████████████████  To give their motion for summary judgment

6  a fighting chance, however, Defendants ignore Plaintiff's version of the pitch (the

7  only version by a firsthand witness) and make up their own version.  In taking this

8  path, Defendants seek to circumvent the most fundamental principal governing

9  summary judgment – that we must accept Plaintiff's admissible evidence as true.

10       In any event, Defendants base their own, inaccurate version of the pitch, in

11  part, on Anne Damato's meeting notes.  Those notes do not accurately describe

12  *GOE*.  Among other things, Damato was only at the first pitch meeting, not the

13  second one, and therefore did not know what was discussed at the second meeting.

14  During the break between the two meetings, ████████████████████████

15  ████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ████████  In addition, each pitch meeting lasted for more than an hour, for a total

18  of more than two hours.  The memo contains only a few minutes of material, and

19  therefore cannot possibly describe everything that was pitched at the meetings.

20  Defendants also base their "version" of the movie pitch on Plaintiff's two-page letter

21  sent to Ron Fricke a few weeks later.  However, that letter does not purport to be a

22  summary of *GOE*.

23      **D.**    **Defendants Offer Plaintiff A Deal For *GOE***

24       At no time during either of the pitch meetings did Defendants tell Plaintiff

25  that they had previously created or were developing any project that was similar to

26  *GOE*.  (Morawski Decl. ¶22)  To the contrary, at the end of the second pitch

27  meeting, Cameron declared that he liked the project very much and wanted to offer

28  Plaintiff a deal.  Cameron stated that Plaintiff should take a few days to think about

350726.1

1  how much money he would need to work on a first draft of the screenplay.

2  (Morawski Decl. ¶23)  On December 12, 1991, Plaintiff sent Cameron a letter

3  identifying his financial requirements to write the script for *GOE*.  (Morawski Decl.

4  Ex. H)  Defendants still have that letter in their files!  They produced it in this case.

5  There is no question they received it.  (Shimamoto Decl. Ex. D [Cameron Tr. 114:5-

6  115:5])  That letter confirms that a deal was offered.

7        On December 13, Larry Kasanoff, Lightstorm's then-President, called

8  Plaintiff.  Kasanoff stated that *he knew Plaintiff had come to Lightstorm and pitched*

9  *an idea that Cameron and Damato had liked.*  (Morawski Decl. ¶¶25-26, Exs. I, J)

10  Damato had told Kasanoff that Plaintiff would tell Kasanoff how much money

11  Plaintiff needed to write the script.  Plaintiff told Kasanoff he would need

12  approximately $4,000 per month for six months.  (*Id.*)  Kasanoff stated he would be

13  meeting with Cameron the next day and would call Plaintiff back.  (*Id.*)

14        Subsequently, however, Kasanoff told Plaintiff that Lightstorm would be

15  unable to enter into a deal with Plaintiff because one of Lightstorm's financial

16  backers, Carolco Pictures, was experiencing financial difficulties.  Kasanoff stated

17  that Lightstorm wouldn't be able to pay Plaintiff to write the script for *GOE* because

18  Lightstorm didn't want Carolco to be able to claim any rights in *GOE*.  (███████

19  ████████████████████████████████  Morawski Decl. Exs. I, K)

20  ████████████████████████████████

21  ███████████████████████████████████████

22  ███████████  Ultimately,  no agreement was ever reached between Plaintiff and

23  Defendants regarding *GOE* and Defendants never acquired the right to use any of

24  the ideas in *GOE*.

25       **E.**    **Cameron Begins Working on *Avatar***

26  ████████████████████████████████████████

27  ██████████████████████████████

28  ████████████████████████████████████████

350726.1

-9-

1 ████████████████████████████████████████████

2 ███████████████

3 ████████████████████████████████████████████

4 ██████████████████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████████████████████████

7 ████████████████████████████████████████████

8 ████████████████████████████████████████████

9 ████████████████████████████████████████████

10 ██████████████████

11 █████████████████████████████████

12 ████████████████████████████████████████████

13 ████████████████████████████████████████████

14 ███████████████████████████████████████████

15 ████████████████████████████████████████████

16 ████████████████████████████████████████████

17 ████████████████████████████████████████████

18 ████████████████████████████████████

19 ████████████████████████████████████████████

20 █████████

21     *Avatar* was not released until December 2009, more than 14 years after

22 Cameron first began working on the scriptment.  (Shimamoto Decl. Ex. L)

23 **III.**   **ARGUMENT**

24     **A.**   ***Guardians Of Eden* Is Original**

25     Defendants' contention that *GOE* is not "original" fails for numerous reasons.

26 ────────────

[1] ██████████████████████████████████████

27 ████████████████████████████████████████████

28

350726.1

1      <u>First</u>, Defendants' actions in 1991 demonstrate <u>they</u> believed *GOE* was

2  original.  Defendants invited Plaintiff back for a second pitch meeting and then

3  offered him a deal.  Defendants would not have done either of those things if they

4  had thought *GOE* was not original.  *Fink v. Goodson-Todman Enterprises, Inc.*, 9

5  Cal. App.3d 996, 1015(1970) (defendants' request that plaintiff sell them the rights

6  to his idea for a television series demonstrates that plaintiff's idea was novel);

7  Lazarus Decl. Ex. B, pp.1, 5.

8      <u>Second</u>, ████████████████████████████

9  ██████████████████████████████████████

10 ██████████████████████████████████████

11 ██████████████████████████████████████

12 ████  Since the story in *Avatar* is based on *GOE*, Defendants' contention that

13 *Avatar* is original necessarily demonstrates that *GOE* is original.

14     <u>Third</u>, Defendants' contention that *GOE* is not original because certain prior

15 works purportedly contain some of the same elements lacks merit.[2]  The California

16 Supreme Court has stated: "The fact that the plan or theme of the plaintiffs' story is

17 similar to the plots of prior stories does not defeat the claim of originality within the

18 meaning of that work for copyright purposes.  'It is not essential that any

19 production, to be original or new within the meaning of the law of copyright, shall

20 be different from another…the true test of originality is whether the production is

21 the result of independent labor or of copying."  *Golding v. R.K.O. Pictures, Inc.*, 35

22 Cal.2d 690, 697 (1950).  Similarly, Nimmer states: "Originality in the copyright

23 sense means only that the work owes its origin to the author, *i.e.*, is independently

24

25 [2]  The NDA was drafted by Defendants' lawyer, and therefore should be construed against Defendants.  *Federal National Mortgage Ass'n v. Bugna*, 57 Cal. App.4[th]

26 529, 535 (1997) (contracts construed against the drafter); *Mayhew v. Benninghoff*, 53 Cal. App.4[th] 1365, 1370 (1997) (doctrine applies with even greater force where

27 drafter is a lawyer).

28

created, and not copied from other works.  Therefore, a work is original and may command copyright protection, even if it is completely identical with a prior work, provided it was not copied from such prior work but is rather a product of the independent efforts of its author."[3]  M. Nimmer, *Nimmer on Copyright*, §2.01[A], at p.2-9.  *See also Weitzenkorn v. Lesser*, 40 Cal.2d 778, 788 (1953) (although the "basic characters and locale of [plaintiff's work] might be held to be unoriginal, the combination of these characters and locale with other characters in a certain style and manner of expression cannot be held, upon demurrer, to lack originality as a matter of law.")

Here, Plaintiff created *GOE* on his own, and did not copy it from any other works.  (Morawski Decl. ¶16)  Thus, *GOE* is original.[4]

Defendants' contention that the novel *Midworld* contains nearly all of the elements of *GOE* is baseless.  As an initial matter, Morawski has never read *Midworld*, and *GOE* is not based on it.  (Morawski Decl. ¶17)  Thus, *GOE* would still be original, even if it was similar to *Midworld* (which it is not).  In addition, as *GOE* is not similar to *Midworld*.  (Disputed Fact No. 330)

Finally, although expert testimony is not necessary to establish originality, Plaintiff's expert Paul Lazarus, has concluded that *GOE* is original.[5]  (Lazarus Decl. Ex. A)

---

[3]  This is consistent with the testimony of Randall Frakes, who submitted a declaration in support of Defendants' motion.  (Shimamoto Decl. Ex. B [Frakes Tr. 12:1-11, 122:5-17])

[4]  Indeed, Cameron identifies numerous prior works that he alleges constituted "reference points and sources of inspiration" for the story in *Avatar*.  Cameron Decl. ¶138.  Yet, Cameron testified the story in *Avatar* is original.  (Shimamoto Decl. Ex. D [Cameron Tr. 57:20-58:1])  Defendants' contention that a work cannot be original if it contains elements that are similar to prior works is therefore inconsistent with Cameron's own testimony.

[5]  The California Supreme Court has stated that the issue of originality is an issue of fact for the jury's determination, not an issue of law.  *Stanley*, 35 Cal.2d at 665.

350726.1

-12-

1   Defendants' contention regarding originality therefore fails.

2   **B.     Defendants' Substantial Similarity Argument Fails**

3   Defendants' argument regarding substantial similarity also lacks merit.

4   <u>First</u>, Defendants' motion applies the incorrect legal standard.[6] This is a

5   contract case, not a copyright case.  Under California law, for a contract case, the

6   two works should be viewed as a whole, without dissection, from the perspective of

7   the average, reasonable person.  *See, e.g., Weitzenkorn v. Lesser*, 40 Cal.2d 778, 790

8   (1953); *Stanley v. Columbia Broadcasting System, Inc.*, 35 Cal.2d 653, 660, 661

9   (1950) (a determination of similarity is that of "the average reasonable man upon a

10  comparative reading of the two works, not by a dissection of sentences and

11  incidents, suitable for the study of a digest or textbook"); *Klekas v. EMI Films, Inc.*,

12  150 Cal. App.3d 1102,  111 (1984) (in comparing two works, "the common

13  knowledge of the average reader, observer, spectator or listener" is the proper

14  standard, and "the works should be viewed as a whole, without dissection and

15  without expert or elaborate analysis").

16  <u>Second</u>, where, as here, access is established, the level of similarity required

17  is lower.  *See, e.g., Golding,* 35 Cal.2d at 695 ([w]here there is strong evidence of

18  access, less proof of similarity may suffice"); *Fink*, 9 Cal. App.3d at 1007 n.14

19  ("[l]ess similarity is required where access is strong"); *Buchwald v. Paramount*

20  *Pictures Corp.*, 13 U.S.P.Q.2d 1497, 1502 (1990) (same).

21  <u>Third</u>, unlike copyright infringement claims, a comparison of the two works

22  in a contract action should include the entirety of the plaintiff's work, and not only

23  those elements that qualify for copyright protection.[7] *Benay v. Warner Bros.*

24  _____

[6]   Two of the cases Defendants repeatedly cite—*Kightlinger v. White*, 2009 WL
25  4022193 (Cal. App. 2d Dist. Nov. 23, 2009), and *Reginald v. New Line Cinema
    Corp.*, 2008 WL 588932 (Cal. Ct. App. Mar. 5, 2008)—are unpublished and
26  therefore are not valid precedent.  (Cal. Rules Court §8.1115)
[7]   Defendants may contend that the NDA's reference to originality means that only
27  elements that qualify for copyright protection should be considered.  As
    demonstrated above, however, the term "original" means only that the ideas were
28  (footnote continued)

350726.1                                **-13-**

1   *Entertainment, Inc.*, 607 F.3d 620, 631 (9th Cir. 2010).

2          Fourth, it is the quality of the similarities, and not their quantity, that matters.

3   "'[E]ven if the similar material is quantitatively small, if it is qualitatively

4   important…the trier of fact…may properly find substantial similarity." *Fink*, 9 Cal.

5   App.3d at 1013 (*quoting Nimmer on Copyright*); *Buchwald*, 13 U.S.P.Q.2d at 1504.

6          Fifth, as a corollary, any dissimilarities between the two works are irrelevant

7   if the defendant's work shares similarities with substantial elements of the plaintiff's

8   work. *Fink*, 9 Cal. App.3d at 1012 ("It is entirely immaterial that in many respects

9   plaintiff's and defendant's works are dissimilar if in other respects similarity as to a

10  substantial element of plaintiff's work can be shown").

11         Finally, where the plaintiff's work is an outline or treatment, as opposed to a

12  finished work, such as a screenplay, the proper inquiry is whether the "structural

13  spine" of defendant's work is similar to that of plaintiff's work. *Fink*, 9 Cal. App.3d

14  at 1010-1011.

15         Application of the above principles demonstrates that Defendants are not

16  entitled to summary judgment on the issue of similarity.  The *Benay* case, which

17  involved the motion picture *The Last Samurai,* is instructive.  In *Benay*, the district

18  court had granted summary judgment in favor of defendant on plaintiff's contract

19  claim.  On appeal, the Ninth Circuit reversed.  In explaining its decision, the Ninth

20  Circuit noted that plaintiff's screenplay and defendant's film shared several

21  similarities:

22            Most notably, in both works, the protagonist is an embittered American

23            war veteran who travels to Japan where he meets the Emperor, trains

24            the Imperial Army in modern warfare, fights against the samurai, and in

25            the end is spiritually restored.  Both works are set at the time of the

26            Satsuma Rebellion of 1877, both works rely heavily on the historical

27  ───────────────

28  created by Plaintiff, and does not exclude ideas that may be present in prior works.

1   figure, Saigo Takamori, and both works share the same title.  These

2   similarities are substantial for purposes of an implied-in-fact contract

3   under California law.

4   607 F.3d at 632.  Although the Ninth Circuit agreed with the district court that there

5   were "many more differences than similarities" between plaintiffs' screenplay and

6   defendants' film, *id.* at 625, the court held there were material issues of fact as to

7   whether "there was unauthorized use by Defendants of elements or ideas from

8   [plaintiffs'] Screenplay."[8] *Id.* at 632.  *See also, e.g., Weitzenkorn,* 40 Cal. 2d 781-

9   782 (reversing trial court's dismissal on demurrer of plaintiff's contract claims;

10  question of fact as to whether defendant used plaintiff's Tarzan synopsis in creating

11  defendant's Tarzan movie, despite differences between the two); *Stanley,* 35 Cal.2d

12  at 662 (affirming verdict finding defendant breached contract by using plaintiff's

13  script for radio program, despite differences between the two); *Fink,* 9 Cal. App.3d

14  at 1006-1015 (affirming appellate court's reversal of dismissal on demurrer of

15  plaintiff's contract claims; sufficient similarities existed between plaintiff's

16  presentation for proposed television series and the television series *Branded* to

17  preclude determination of lack of similarity as a matter of law),[9] *Minniear v. Tors,*

18  266 Cal. App.2d 495 (1968) (affirming verdict that defendant had breached contract

19  by using plaintiff's pilot for an underwater television series to create defendant's

20  series *Sea Hunt*); *Buchwald* 13 U.S.P.Q.2d at 1504 (movie *Coming to America* was

21  based on plaintiff's treatment *King For a Day,* despite differences between the two

22  works).

23      Application of the above principles demonstrates that Defendants' motion

24

25  [8]  The differences the Ninth Circuit found between plaintiffs' script and
    defendants' movie included that the narratives in the two works were "strikingly

26  different," 607 F.3d at 625-26, that the characters of the leader of the samurai
    rebellion and the Japanese Emperor were very different, *id.* at 627, and the works'

27  themes were developed in very different ways. *Id.* at 629.
    [9]  The court stated that "[a] change in setting can be ignored." *Id.* at 1012.

28

1  should be denied, as the combination of essential elements in both *Avatar* and *GOE*
2  are more than similar—they are virtually identical.

3  • The basic plots are the same: an injured veteran travels to the jungle to
4  attempt to find a cure for his disability. Upon arriving at the jungle, the
5  veteran unexpectedly spends a night alone in the jungle, where he sees
6  many strange phenomena—unusual animals and plants that glow. The
7  first person he meets is the daughter of a tribal leader. Natural
8  phenomena identify the veteran to the tribal chieftain's daughter as the
9  chosen one. In *GOE*, bioluminescent tree seeds light up around Ray's
10  head and upon him. In *Avatar*, woodsprites float down from the sky
11  and land on Jake. Neytiri describes them as "Seeds of the Secret Tree."
12  (Landau Decl. Ex. 17, at 101) The maiden teaches the veteran the ways
13  of the tribe, and they eventually become mates. The indigenous people
14  live at one with nature, and have primitive weapons. They also have
15  the ability to merge their consciousness with animals and control their
16  actions. The jungle itself is alive, and has a neural network of plants
17  that allows the planet to know what is occurring in other areas. The
18  planet has positive effects on those who are good, but negative effects
19  on those who have hostile intentions. The jungle contains mountains
20  with near-vertical cliffs, and strong electromagnetic forces that interfere
21  with and disable electronic equipment. The jungle is invaded by a
22  mining company that has come to the area to obtain a valuable mineral.
23  The mining company hires mercenaries to attempt to remove the
24  indigenous people as an obstacle to obtaining the mineral. The leader
25  of the mercenaries is a military veteran and the primary antagonist.
26  The mercenaries must wear oxygen masks to avoid the plants' harmful
27  effects. The veteran and the indigenous people have to repel the
28  mining company's mercenary army. They are assisted by a female

350726.1

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [REDACTED]

scientist who has come to the jungle to study the plants, as well as by
the planet itself.  A grand battle, the indigenous people and the planet
ultimately prevail.

The primary characters in both works are also virtually identical:

- The male protagonist is a military veteran who is suffering from a
  physical disability as a result of his service, and travels to the jungle to
  seek a remedy for his physical ailments (Ray in *GOE*; Jake in *Avatar*.)
  As described above, he meets the daughter of a tribal chieftain and
  becomes her mate, and becomes a member of the tribe.  His physical
  disability is cured while he is in the jungle.  He ultimately leads the
  indigenous people in their attempt to repel the attack of the mining
  company's mercenaries.

- One of the primary female protagonists is the daughter of a tribal leader
  (Maya in *GOE*; Neytiri in *Avatar*.)  She teaches the veteran the ways of
  the tribe and becomes his mate.

- The other primary female protagonist is a female scientist who has
  come to the area to study the jungle's plant life (Eve in *GOE*; Grace in
  *Avatar*.)  She ultimately assists the veteran, the indigenous people and
  the planet in their battle against the invading mining interests and its
  mercenaries.

- The two primary protagonists from outside the jungle—Ray and Eve in
  *GOE*; Jake and Grace in *Avatar*—have the ability to transport their
  consciousness outside their physical bodies while their human bodies
  are in a dreamlike state.  In *Avatar*, the Na'vi refer to the humans'
  avatars as "dream walkers."

- The primary villain is the leader of the mining company's mercenaries,
  who attempt to eliminate the indigenous people so the mining company

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [REDACTED]

1    can have access to the minerals it desires (L.K. in *GOE*; Quaritch in

2    *Avatar*.)

3    •   The planet itself is a character, and has a collective consciousness.

4    There is a vast neural plant network, that allows the planet to know

5    what is occurring on other areas.  The planet distinguishes between

6    good and evil and has positive effects on those who have good

7    intentions, and negative consequences for those who have hostile

8    intentions.  In both *GOE* and *Avatar*, the "good guys" are able to travel

9    in the forest without any oxygen masks (in *Avatar*, Jake and Grace do

10    this in their avatar forms), while the bad guys must wear protective

11    masks.  The planet participates in the battle against the mining

12    company and its mercenaries.  In *Avatar*, the Na'vi's battle against the

13    mining company's mercenaries appears lost until the planet's animals

14    come to the rescue and help defeat the mercenaries.

15    These similarities are far more substantial than those the Ninth Circuit found

16 to defeat summary judgment in *Benay,* or in the other cases cited above.  The

17 similarities do not relate to tangential matters, but instead go to the very essence of

18 *Avatar*.  If the similarities between *GOE* and *Avatar* were deleted from *Avatar*,

19 virtually all that would remain are the film's exotic creatures, secondary characters,

20 and technological marvels.  Moreover, the standard for similarity is lower here,

21 since it is undisputed that Defendants had access to *GOE*.

22    The similarity between *Avatar* and *GOE* ████████████████████

23 ████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ████████████████████████████████████████████████████

28 ████████████████████████████████ These individuals epitomize the "average,

1 | reasonable person" standard under California law.  In addition, although the issue of

2 | similarity is not one for expert determination, Plaintiff's expert, Paul Lazarus, has

3 | concluded that *Avatar* is substantially similar to *GOE*.  (Lazarus Decl. Ex. B.)

4 |      Defendants' contention that elements from Cameron's prior works that are

5 | also in *Avatar* should be filtered out from the analysis of similarity is incorrect.[10]

6 | Plaintiff's claim of similarity is not based on the existence of random, isolated

7 | similarities between the two works.  Instead, Plaintiff's claim is based on the

8 | similarity between the combination of substantial elements in *GOE* and *Avatar*.

9 |      Indeed, the prior works Defendants cite as purportedly constituting the

10 | forerunners of various elements in *Avatar* (*e.g.*, *Xenogenesis*, *Wind Warriors*,

11 | *Mother*) demonstrate that the same elements can be combined in dramatically

12 | different ways, creating completely different works.  No reasonable, average

13 | individual would read any of those works and think it is similar to either *GOE* or

14 | *Avatar*.  In addition, Cameron's notes for *Avatar* demonstrate that the same elements

15 | can be combined in substantially different ways.  For example, Cameron's notes

16 | indicate that one of the options he considered was having the romance be between

17 |

18 | [10] The cases Defendants cite do not support their claim of filtering.  In *Green v. Schwarzenegger*, 1995 WL 874191 (C.D Cal. July 12, 1995), the alleged similarities

19 | upon which plaintiff's claim was based were isolated elements (*e.g.*, the Terminator's metallic form).  Unlike here, the plaintiff did not allege that the

20 | combination of elements in her work was also present in *Terminator 2*.  It therefore was reasonable for the court to analyze each element individually and determine

21 | whether that element was present in defendant's prior work.  Similarly, the alleged similarities in *Murray Hill Publications, Inc. v. Twentieth Century Fox Film Corp.*,

22 | 361 F.3d 312 (6th Cir. 2004), were isolated elements, rather than a combination of elements.  The court stated, "Where, as here, the slight similarities are not

23 | thematically related, the whole is no greater than the sum of the parts."  In addition, that case, which was decided by the Sixth Circuit, involved a claim for copyright

24 | infringement, and therefore did not use the test for similarity that applies in a contract claim under California law.  *Kimbell v. Rock*, 2009 WL 3248208 (C.D. Cal.

25 | Oct. 8, 2009), also involved a claim of copyright infringement.  The court's discussion of filtering arose in the context of the application of the "extrinsic test,"

26 | which involves the dissection of the works into isolated components.  That is not the proper test in contract claims.  Thus, Defendants' cases do not support Defendants'

27 | claim that elements contained in Defendants' prior works should be filtered out in determining whether *Avatar* is similar to *GOE*.

28 |

350726.1

-19-

1  two human avatar controllers, and that either the male or the female could be

2  crippled.  (Cameron Decl. Ex. 22, at 319)  Ultimately, however, Defendants decided

3  to make the romance between an injured military veteran and the daughter of the

4  leader of an indigenous tribe (just as in *GOE*), and it is the male who has a physical

5  disability (just as in *GOE*).  Similarly, Cameron had contemplated having the only

6  inhabitants on the new planet be the human-created avatars, which the mining

7  corporation created to be a workforce on the planet.  (*Id.* at 319-320)  Those human-

8  created avatars are the creatures who fight against the corporation.  (*Id.* at 320)  In

9  the film, however, the mining company's opposition is instead the pre-existing

10  indigenous people— just as in *GOE*.  Thus, although there are numerous ways in

11  which the same elements can be combined, in virtually every significant instance,

12  Defendants adopted the same combination in *Avatar* that Plaintiff used in *GOE*.

13       Finally, it is highly significant that ████████████████████████████

14  ████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████

17  ██████  Defendants' contention that they are entitled to summary judgment on the

18  ground of substantial similarity therefore fails.

19

20  

21

22

23

24

25

26

27

28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [REDACTED]

C.   **Defendants' "Independent Creation" Argument Lacks Merit**

Defendants' contention that Plaintiff's claims should be dismissed because Cameron purportedly independently created certain of the elements in *Avatar* before Plaintiff pitched *GOE* to Defendants also should be rejected.

First, even assuming Cameron did create certain elements contained in *Avatar* prior to 1991, there is no dispute that he did not arrive at the combination of themes, characters, sequences of events and plot in *Avatar* until *after* Plaintiff pitched GOE to Defendants. The prior screenplays/outlines/treatments Defendants cite were all created long before Plaintiff's 1991 pitch. Defendants assert that *Chrysalis* was 1973-1974, *Xenogenesis* was 1977-1979, *Mother* was 1980-1981, and *Wind Warriors* was 1980s. None of those projects was ever produced. In Plaintiff's view, it is no coincidence that it was only *after* Plaintiff pitched GOE to Defendants in 1991 that Cameron was purportedly able to "create" the story in *Avatar*. *See, e.g., Benay*, 607 F.3d at 630 (noting that, although it was undisputed that defendants had begun writing a script about a civil war veteran who travels to Japan and assists the samurai before having access to plaintiff's screenplay, defendants' script changed after such access to become more similar to plaintiff's screenplay).

Defendants' contention is similar to that of a knockoff designer who has copied a popular design that contains a variety of elements combined in a unique fashion (*e.g.,* a heart, flowers, leaves), but contends that his creation was independently created because he had previously created one work that had a heart, another that had flowers, and a third that had leaves. Such a claim would be baseless.

Second, if Cameron had in fact created the story for *Avatar* prior to Plaintiff's pitch of *GOE*, Defendants would have stopped Plaintiff during the pitch and told him they had already created or were in the process of developing something similar. (Lazarus Decl. Ex. B at 1, 5) Defendants did not do that. Instead, they invited Plaintiff back for a second pitch meeting, and then offered him a deal. They

350726.1

-21-

1  would not have done that if Cameron had already created the story for *Avatar* prior

2  to Plaintiff's pitch of *GOE*.

3      Third, the prior works Defendants cite are nothing like *GOE* or *Avatar*. As

4  stated above, no person who read or saw any of the prior works Defendants cite

5  would confuse them with *Avatar*. For example, Defendants allege in their motion

6  that "Cameron based much of *Avatar* on his work from *Xenogenesis*. (Motion at

7  11:17-18) At his deposition, however, █████████████████████████████

8  ████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████

11 Similarly, Defendants identify *Wind* Warriors as one of the prior works on which

12 *Avatar* is based. William Wisher, who submitted a declaration in support of

13 Defendants' motion, and was one of the co-authors of *Wind Warriors* (Cameron Tr.

14 197:3-8) testified that he didn't think anything in *Avatar* was based on *Wind*

15 *Warriors*. (Shimamoto Decl. Ex. AA [Wisher Tr. 14: 15-19]) Wisher further

16 testified that Cameron had never told him that anything in *Avatar* was based on

17 *Wind Warriors*.[12] (*Id.* 14:21-23) Indeed, Cameron concedes that *Wind Warriors*

18 and *Avatar* "are completely different projects and tell far different stories."

19 (Cameron Decl. ¶83) In addition, many of the prior sources Defendants cite relate

20 to material in *Avatar* that Plaintiff does not contend are based on *GOE*, such as the

21 fan lizard, aerocoelenterate, bansheerays, spaceship, AMP suit, blue creatures, and

22 magenta grass. (Cameron Decl. ¶¶ 27, 44-50, 55-58)

23     Fourth, Defendants' allegation of independent creation is a post hoc litigation-

24 created concoction. For example, Cameron's notes when he first began developing

25 *Avatar* refer to *Avatar* as a "new concept," and not a compilation of Cameron's prior

---

12 ████████████████████████████████████████████████████████
███████████████

-22-

1 │ ideas.  (Cameron Decl. Ex. 22 at 319)  In addition, although Cameron's notes do

2 │ refer to certain pre-existing works (which do not contain elements upon which

3 │ Plaintiff's claims here are based), they do not reference most of the sources

4 │ Defendants now claim formed a basis for *Avatar*.  Similarly, during his deposition,

5 │ Cameron did not identify most of those alleged sources as bases for *Avatar*.  Indeed,

6 │ although Defendants agreed in July to produce all documents supporting their

7 │ defense of independent creation (Shimamoto Decl. Exs. Y, Z), they did not produce

8 │ any documents regarding *Chyrsalis* until October 26, 2012, and did not produce any

9 │ documents regarding *Mother* until November 8, just a few days before they filed

10 │ their summary judgment motion.  (Shimamoto Decl. ¶28)  Since Defendants did not

11 │ produce those documents until many months after Cameron's July 31, 2012

12 │ deposition, Plaintiff never had an opportunity to question him about them.

13 │ 　　　Defendants' independent creation argument therefore fails.

14 │ 　　　**D.**　　**Plaintiff Can Assert Both Express And Implied Contract Claims**

15 │ 　　　Plaintiff does not dispute that he cannot recover on both his express contract

16 │ and implied contract claims against Defendants.  Plaintiff is, however, permitted to

17 │ plead in the alternative, and elect his remedies later.  *See, e.g., In re De Laurentis*

18 │ *Entertainment Group, Inc.*, 963 F.2d 1269, 1272 (9th Cir. 1992); *Goldwater v.*

19 │ *Oltman*, 210 Cal. 408, 423 (1930).  Plaintiff therefore can pursue both his express

20 │ and implied contract claims at this stage of the proceedings.

21 │ 　　　**E.**　　**Plaintiff's Contract Claims Are Not Barred By The Statute Of**

22 │ 　　　　　**Limitations**

23 │ 　　　Defendants' statute of limitations argument also fails.  Defendants breached

24 │ their agreement with Plaintiff when *Avatar* was publicly released in the United

25 │ States, on or about December 18, 2009.  (Shimamoto Decl. Ex. L)  Thus, that is the

26 │ date on which Plaintiff's claims accrued.  *Benay*, 607 F.3d at 632-33 (statute of

27 │ limitations began running when film was released to the general public); *Donahue v.*

28 │ *United Artists Corp.*, 2 Cal. App.2d 794, 801-02 (1970) (same).  Plaintiff filed his

350726.1

**-23-**

1 complaint on December 13, 2011, which is less than two years after his claims

2 accrued.  Plaintiff's claims therefore are not barred by the statute of limitations.[13]

3      Defendants' contention that Plaintiff's express contract claim accrued on

4 December 5, 2005, when Defendants transferred the rights in *Avatar* to Fox, even

5 though Plaintiff did not know and had no reason to know of such transfer, lacks

6 merit.  California applies the discovery rule, which provides that a cause of action

7 does not accrue until the plaintiff discovers or should have discovered all facts

8 essential to his claim, particularly where the breach is committed in secret and the

9 plaintiff will not discover the harm from the breach until later.  *See, e.g., April*

10 *Enterprises, Inc. v. KTTV*, 147 Cal. App.3d 805,  826-27 (1983); *Gryczman v. 4550*

11 *Pico Partners, Ltd.*, 107 Cal. App.4th 1, 4-6 (2003) (noting that defendants should

12 not be allowed to profit from their victims' ignorance).  In addition, the harm that is

13 the subject of Plaintiff's claim here is the damage caused by the release to the

14 general public of a film that is based on *GOE*.  That public release is what has

15 destroyed the value of *GOE*.  Since the public release is the act that caused the harm

16 to Plaintiff, it is also the act that caused Plaintiff's claim to accrue.  Defendants'

17 statute of limitations argument therefore lacks merit.

18      **F.**    **Plaintiff's Fraud Claim Should Not Be Dismissed**

19      Defendants' motion also should be denied with respect to Plaintiff's fraud

20 claim.  The California Supreme Court has stated that an intent not to perform the

21 promise "must often be established by circumstantial evidence," such as

22 "defendant's insolvency, his hasty repudiation of the promise, his failure even to

23 attempt performance or his continued assurance after it was clear he would not

24

---

25 [13]  The profit and loss statement Defendants cite does not support their statute of limitations argument.  That statement refers to certain of the images in *Avatar*, not its story.  By November 2009, Plaintiff had seen trailers for *Avatar* and believed

26 certain of the images were based on artwork he had shown to Defendants.  That statement does not refer to the story in *Avatar*.  Plaintiff did not learn the story in

27 *Avatar* until he actually saw the film on or after December 18, 2009.  (Morawski Decl. ¶31)

28

350726.1

1   perform." *Tenzer v. Superscope, Inc.*, 39 Cal.3d 18, 30-31 (1985).  Here,

2   Defendants' intent not to perform can be inferred from, among other things, their

3   offer of a deal to Plaintiff after his second pitch meeting, and their subsequent

4   retraction of that offer a few days later under the pretext of Carolco's financial

5   difficulties.  In addition, dismissal of a fraud claim on summary judgment is

6   inappropriate where summary judgment is denied as to the contract claim.  *Patriot*

7   *Rail Corp. v. Sierra Railroad Co.*, 2011 WL 318400, at *10 (E.D. Cal. Feb. 1, 2011)

8   ("when a triable issue of fact remains as to whether a breach of contract occurred, it

9   is generally not appropriate to summarily adjudicate a fraud claim based around the

10  contract or its terms").

11          Defendants' contention that Plaintiff was not damaged by the fraud also fails,

12  as Plaintiff was injured because he would not have disclosed *GOE* to Defendants

13  absent their false promise.  Defendants' motion therefore should be denied.

14

15  DATED:  December 6, 2012          BROWNE GEORGE ROSS LLP

16

17                                    By  ___/s/Peter W. Ross_____
                                          Peter W. Ross

18                                    Attorneys for Plaintiff Gerald Morawski

19

20

21

22

23

24

25

26

27

28

350726.1

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [REDACTED]

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 2121 Avenue of the Stars, Suite 2400, Los Angeles, CA 90067.

On December 6, 2012, I served true copies of the following document(s) described as **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [REDACTED]** on the interested parties in this action as follows:

| | |
|---|---|
| Robert H. Rotstein, Esq.<br>Elaine K. Kim, Esq.<br>MITCHELL SILBERBERG & KNUPP LLP<br>11377 West Olympic Boulevard<br>Los Angeles, California 90064-1683<br>Tel.: 310.312.2000<br>Fax: 310.312.3100<br>rxr@msk.com<br>ekk@msk.com | Attorneys for Defendants Lightstorm Entertainment, Inc. and James Cameron |

**BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on December 6, 2012, at Los Angeles, California.

Diane Torosvan

350726.1