1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GERALD MORAWSKI, an individual, | ) | CASE NO. CV 11-10294 MMM (JCGx) |
| Plaintiff, | ) ) | ORDER GRANTING DEFENDANTS' |
| vs. | ) ) | MOTION FOR SUMMARY JUDGMENT |
| LIGHTSTORM ENTERTAINMENT, INC., a California corporation; JAMES CAMERON, an individual; DOES 1-10 | ) ) ) ) | |
| Defendants. | ) ) ) ) | |

Gerald Morawski filed this action against Lightstorm Entertainment, Inc. ("Lightstorm"), James Cameron, and certain fictitious defendants on December 13, 2011, alleging that defendants unlawfully used his original ideas in the film *Avatar*.[1]  Morawski filed a first amended complaint on January 4, 2012, alleging claims for breach of an express contract, breach of an implied-in-fact contract, fraud, and negligent misrepresentation.[2]  On November 13, 2012, defendants filed a

---

[1]Complaint, Docket No. 1 (Dec. 13, 2011).

[2]First Amended Complaint, Docket No. 6 (Jan. 4, 2012).

motion for summary judgment on all claims asserted in the first amended complaint.[3]  Morawski opposes the motion.[4]

# I. BACKGROUND

## A.    Morawski Meets With Defendants

Lightstorm is a production company headed by film maker James Cameron.[5]  Morawski is a visual effects consultant.[6]  Cameron first met Morawksi in 1991, because Cameron was interested in some artwork Morawski had created.[7]  On October 29, 1991, Cameron purchased four pieces of Morawski's art.[8]  Thereafter, Lightstorm required that Morawski sign a Confidentiality and Non-Disclosure Agreement ("Agreement");[9] the Agreement was executed on December 4, 1991.[10]  It stated, in relevant part:

"All Material and other information furnished by Lightstorm to you, as well as any

ideas and responses furnished by you, shall be the sole and exclusive property pf

Lightstorm, which may freely exploit same in any manner or kind, without any

restriction whatsoever and without payment or any other obligation or liability to

_____

[3]Motion for Summary Judgment ("MSJ"), Docket No. 115 (Nov. 13, 2012); Reply in Support of Motion for Summary Judgment ("Reply"), Docket No. 169 (Dec. 20, 2012).

[4]Memorandum in Opposition to Motion for Summary Judgment ("Opp."), Docket No. 154 (Dec. 6, 2012).

[5]MSJ at 1.

[6]Separate Statement of Undisputed Facts and Conclusions of Law ("SUF"), Docket No. 116 (Nov. 13, 2012), ¶ 145; Plaintiff's Statement of Genuine Issues of Material Fact ("SGI"), Docket No. 155 (Dec. 6, 2012), ¶ 145.

[7]SUF, ¶ 149; SGI, ¶ 149.

[8]SUF, ¶ 150; SGI, ¶ 150.

[9]SUF, ¶ 151; SGI, ¶ 151.

[10]SUF, ¶ 158; SGI, ¶ 158.

you. . . . Nothwithstanding the foregoing, Lightstorm shall not own, and you shall retain as your exclusive property, all original ideas and artwork created by you which are not derived from Lightstorm's Material, and should Lightstorm wish to acquire your property, the parties will negotiate therefor."[11]

Subsequently, Morawski had two additional meetings with Cameron, in which he pitched an idea for a film titled *Guardians of Eden*.[12]  The first meeting, which occurred on December 4, 1991, was also attended by Anne Damato, a Lightstorm employee responsible for attending pitch meetings and taking notes concerning the ideas presented.[13]  After the meeting, on December 6, 1991, Morawski faxed Damato a typed document captioned "Conceptual Summary of 'Guardians of Eden.'"[14]  Later that month, Lightstorm's then-president, Larry Kasanoff, told Morawski that Lightstorm was unable to take a development option on *Guardians of Eden*, and that the only way the project could move forward was if Morawski wrote and submitted a screenplay.[15]  Morawksi never wrote a screenplay for *Guardians of Eden*, and Lightstorm did not develop the project.[16]

Subsequently, on December 27, 1991, Morawski sent a two-page letter to another filmmaker, Ron Fricke, in which he provided a short outline of a story similar to that described

---

[11]Declaration of Elaine K. Kim ("Kim Decl."), Docket No. 121 (Nov. 13, 2012), Exhibit 32 ("Agreement").

[12]SUF, ¶ 170; SGI, ¶ 170.

[13]Declaration of James Cameron ("Cameron Decl."), Docket No. 117 (Nov. 13, 2012), ¶ 7b.

[14]SUF, ¶¶ 190, 192; SGI, ¶¶ 190, 192.  Morawski disputes that this document represents a full summary of *Guardians of Eden*; he does not dispute, however, that he sent the document to Damato.

[15]SUF, ¶ 204; SGI, ¶ 204.  Morawski asserts that Kasanoff initially offered him a deal for *Guardians of Eden*, but retracted it due to the financial difficulties being experienced by one of Lightstorm's backers.  (Declaration of Gerald Morawski ("Morawksi Decl."), Docket No. 154 (Dec. 6, 2012), Exh. F ("Morawski Depo.") at 237:13-238:8).

[16]SUF, ¶ 205; SGI, ¶ 205.

in the Conceptual Summary he sent Damato.[17]  Fricke also declined to move forward with the project, stating that he lacked the necessary investors to develop the film.[18]  It appears that *Guardians of Eden* has never been developed or filmed.

**B.**    **Overview of *Guardians of Eden***

---

[17]SUF, ¶¶ 207, 209; SGI ¶¶ 207, 209.  As with the Conceptual Summary, Morawski disputes that the letter he sent to Fricke constitutes a full summary of *Guardians of Eden*.

[18]SUF, ¶ 212; SGI, ¶ 212.



1    ██████████████[19]

## C.    Cameron Develops *Avatar*

In 1995, four years after Morawski's pitch, Cameron wrote a lengthy "scripment" for *Avatar*.[20]  He sent copies of the scripment to Twentieth Century Fox in 1996, but ultimately decided not to move forward with the project because he believed that the technology necessary to make the film was not sufficiently developed.[21]  A decade later, in 2005, Cameron revisited the idea of making *Avatar*, and Lightstorm transferred all rights to the project to Twentieth Century Fox.[22]  From late 2005 to 2006, Cameron wrote a first draft of the script for *Avatar*.[23] In January 2007, Twentieth Century Fox announced that it had given the project the green light.[24] The film was released in December, 2009.[25]

## D.    Summary of *Avatar*

*Avatar* is set largely in 2154 A.D.   The story takes place on Pandora, a distant moon on which two groups live (i) humans affiliated with the Resources Development Administration ("RDA"), which mines unobtanium, an energy source used on Earth; and (ii) the Na'vi, ten-foot tall, blue-skinned, long-tailed, preternaturally strong humanoids indigenous to Pandora.[26]  Avatars are genetically-engineered hybrid bodies that look like Na'vi, but are controlled by humans via

---

[19]██

[20]SUF, ¶ 12; SGI, ¶ 12.  A scripment is a heavily detailed, script-length treatment written in narrative form.  (Cameron Decl., ¶ 8).

[21]SUF, ¶¶ 213, 214; SGI ¶¶ 213, 214.  Morawski does not dispute these facts, but asserts he has no knowledge of them.

[22]SUF, ¶¶ 216, 217; SGI, ¶¶ 216, 217.

[23]SUF, ¶ 218; SGI, ¶ 218.

[24]SUF, ¶ 225; SGI, ¶ 225.

[25]SUF, ¶ 1; SGI, ¶ 1.

[26]SUF, ¶ 2; SGI, ¶ 2.

a mental link; these avatars are used to interact with the Na'vi.[27]

The protagonist is Jake Sully, a 22-year-old paraplegic ex-marine, who travels to Pandora to work in the Avatar program.[28]  Jake was selected because his late-twin brother Tom had been an avatar operator, and the program needed an individual with related DNA to assume Tom's responsibilities.[29]  On Pandora, Jake meets Grace Augustine, the head of the avatar program, and begins his avatar training.[30]

While exploring the forest with his avatar, Jake becomes separated from his colleagues after fleeing from ferocious alien animals.[31]  As night falls, a Na'vi named Neytiri discovers him in the forest; she is prepared to shoot him with an arrow when a "woodsprite," a small, bioluminescent, creature like a jelly-fish floats down from the sky and lands on her bow.[32]  When Neytiri approaches and interacts with Jake, a swarm of woodsprites descend and surround Jake.[33]  Neytiri takes this as a sign, and brings Jake to her clan's home in a gigantic tree, known as Hometree.[34]  The other clan members are skeptical of Jake, but decide to study him once they discover he might have useful information about the humans on Pandora.[35]  Rather than kill him, the clan leader orders Neytiri to teach Jake the Na'vi ways.[36]

---

[27]SUF, ¶ 2; SGI, ¶ 2.

[28]SUF ¶ 3; SGI, ¶ 3.

[29]SUF, ¶ 3; SGI, ¶ 3.

[30]SUF, ¶ 3; SGI, ¶ 3.

[31]SUF, ¶ 4; SGI, ¶ 4.

[32]SUF, ¶ 4; SGI, ¶ 4.

[33]SUF, ¶ 4; SGI, ¶ 4.

[34]SUF, ¶ 4; SGI, ¶ 4.

[35]SUF, ¶ 5; SGI, ¶ 5.

[36]SUF, ¶ 5; SGI, ¶ 5. The clan is distrustful of the avatar program and refer to the avatars as "dreamwalkers."  (Landau Decl., Exh. 17 at 105).

As Jake undergoes Na'vi training, he lives a dual life.  When in avatar form, he trains as a Na'vi warrior; when he "de-links" from his avatar, he reports to Quaritch and RDA's administrator, Parker Selfridge.[37]  Selfridge tells Jake that Hometree sits atop a huge deposit of unobtanium; he gives Jake three months to convince the Na'vi to leave the tree or RDA will take it by force, using Quaritch's mercenaries.

Eventually, Jake falls in love with Neytiri, and transfers his allegiance from the humans to the Na'vi.[38]  Jake joins the Na'vi in their battle against the humans, but Hometree is destroyed by the mercenaries' superior weaponry.[39]  Grace, the head of the avatar program, is killed, and the clan retreats to the Tree of Souls, the most holy site on Pandora.[40]

In the climactic battle scene, Jake rides on a legendary flying creature called a Toruk.[41] Riding the Toruk, Jake recruits thousands of warriors from neighboring clans to join the battle against the mercenaries.[42]  The Na'vi are on the brink of defeat until Pandoran wildlife joins in the defense and attack the human mercenaries.[43]  The Na'vi win the battle, and Quaritch is killed. The movie ends with a Na'vi ritual that will permanently transfer Jake's consciousness to his avatar.[44]

### E.    Morawski's Claims

Morawski argues that original elements of *Guardians of Eden* were used in *Avatar* without his consent.  He identifies nineteen alleged similarities between his story and *Avatar*: (1) an epic

---

[37]SUF, ¶ 6; SGI, ¶ 6.

[38]SUF, ¶ 7; SGI, ¶ 7.

[39]SUF, ¶ 7; SGI, ¶ 7.

[40]SUF, ¶ 7; SGI, ¶ 7.

[41]SUF, ¶ 8; SGI, ¶ 8.

[42]SUF, ¶ 8; SGI, ¶ 8.

[43]SUF, ¶ 8; SGI, ¶ 8.

[44]SUF, ¶ 8; SGI, ¶ 8.

struggle takes place between evil mining interests that will destroy the planet to satisfy their greed, and an indigenous tribe that lives at one with, and protects, its rain forest environment; (2) the planet has a collective consciousness and spirituality, which manifests itself in the plant life, and has a vast neural plant mind that is aware of what threatens it in other locations; (3) both stories are set in a primitive jungle/rain forest; (4) the area contains mountains with near-vertical cliffs, and strong electromagnetic forces that interfere with and disable electronic equipment; (5) the hero is a military veteran who is physically disabled as a result of his military service; (6) upon his arrival in the area, an unexpected emergency forces the veteran to spend a night alone in the rainforest, where he sees unusual animals and plants that glow; (7) the veteran is found in the forest by a second protagonist – a daughter of a tribal leader; (8) the veteran is marked by bio-luminescent plant life;(9) he marries the indigenous woman and becomes a tribal leader; (10) characters are able to transport their consciousness into a second form; (11) the tribes live in harmony with nature; (12) certain tribe members can merge their consciousness with animals and control them; (13) another protagonist is a capable, strong female scientist; (14) the antagonist is an evil mining conglomerate wishing to exploit the environment for a valuable resource; (15) an army of mercenaries, lead by a former military officer, works for the corporation; (16) the air is harmful to evil characters, but not to good characters; (17) a battle between the protagonists and the mercenaries ensues; (18) the protagonists prevail, despite their inferior technology, and the mercenary leader dies; and (19) the planet itself plays a role in defeating the mercenaries.[45]

Based on Cameron's purportedly unauthorized use of these characters, plot points, and themes, Morawski contends that defendants breached the Agreement, breached an implied-in-fact agreement that they would not use his ideas, and are guilty of fraud and negligent misrepresentation.

---

[45]Kim Decl., Exh. 29 at 7-10.

## II.  DISCUSSION

### A.     Standard Governing Motions for Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PROC. 56(c).  A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case.  See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts  showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); FED.R.CIV.PROC. 56(e). Conclusory, speculative testimony in affidavits or moving papers is insufficient to meet this burden, or raise genuine issues of fact defeating summary judgment.  See *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment"); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

"It is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).  "At the summary judgment stage," however, courts "do not focus on the admissibility of the evidence's form.  [They] instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (citing *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001), and *Federal Deposit Ins. Corp. v. New Hampshire Ins. Co.*, 953 F.2d 478, 485 (9th Cir. 1991)); see *Cutrona v. Sun Health Corp.*, No. CV

1   06-2184-PHX-MHM, 2008 WL 4446710, *7 (D. Ariz. Sept. 30, 2008) (on summary judgment,

2   "hearsay is admissible if there is any way to present it in an admissible form at trial"); see also

3   *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary

4   judgment, we may consider only that evidence which can be reduced to an admissible form").

5           In judging the evidence presented in support of or opposition to summary judgment, the

6   court does not make credibility determinations or weigh conflicting evidence.  Rather, it draws

7   all inferences in the light most favorable to the nonmoving party.  See *T.W. Electric Service, Inc.*

8   *v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).  Nonetheless,

9   conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine

10  issues of fact and defeat summary judgment.  See *Falls Riverway Realty, Inc. v. Niagara Falls*,

11  754 F.2d 49, 56 (2d Cir. 1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th

12  Cir. 1979).

13      **B.      Whether Defendants Are Entitled to Summary Judgment on Morawski's**

14              **Breach of Express Contract Claim**

15          Defendants first assert that they are entitled to summary judgment on Morawski's breach

16  of an express contract claim.  The required elements of a breach of contract claim are: (1) the

17  existence of a contract, (2) performance by the moving party, (3) breach by the defaulting party,

18  and (4) resulting damage to the moving party.  *Great American Insurance Co. v. MIVCO Packing*

19  *Co., LLC*, No. C-08-05454 RMW, 2009 WL 942390, *3 (N.D. Cal. Apr. 6, 2009) (citing

20  *Amelco Electric v. City of Thousand Oaks*, 27 Cal.4th 228, 243 (2002)).  See also *Landstar*

21  *Ranger, Inc. v. Parth Enterprises, Inc.*, 725 F.Supp.2d 916, 920 (C.D. Cal. 2010).

22          Defendants  do  not  dispute  the  fact  that  there  is  an  agreement  between  them  and

23  Morawski.[46]  They contend, however, that Cameron independently created *Avatar*, that they did

24  not use any of Morawski's original ideas or property, and therefore that they did not breach the

25  Agreement.

26

27  _____

28          [46]Reply at 19 ("Defendants concede the Agreement is valid").

11

### 1.   Legal Standard Governing Independent Creation

In order to demonstrate a breach of the Agreement, Morawski must prove that defendants used his intellectual property without his authority.  Evidence that defendants independently created *Avatar*, however, can rebut an inference of use as a matter of law.  See *Hollywood Screentest of America, Inc. v. NBC Universal, Inc.*, 151 Cal.App.4th 631, 646 (2007).  As the California Court of Appeal explained in *Hollywood Screentest*, the doctrine of independent creation was first announced in *Teich v. General Mills, Inc.*, 170 Cal.App.2d 791 (1959):

> "In *Teich*, the plaintiff had developed an idea for a children's item and submitted the idea to General Mills with the thought that it might be used as a cereal box prize.  In the summer of 1955 he met with an advertising and sales promotion manager at a division of General Mills, who encouraged him to develop the idea.  Teich's subsequent efforts to contact this manager were unsuccessful, but the following January he noticed a promotion for a similar item on a General Mills cereal box and, upon purchasing and opening the box, found inside the box an item markedly similar to the one he had presented to the company.  He sued General Mills, claiming that the company had used his idea and that he was therefore entitled to compensation.  He won before the jury but the trial court granted General Mills's motion for judgment notwithstanding the verdict.
>
> The Court of Appeal affirmed the trial court's grant of judgment notwithstanding the verdict.  The court explained that the defendant's receipt of plaintiff's idea for the product, and the similarity between plaintiff's idea and defendant's product, created an 'inference' that the defendant used plaintiff's idea.  However, the court found that this inference of use could be dispelled as a matter of law by direct evidence of independent creation.  Such evidence existed in *Teich*.  It consisted of the testimony of three witnesses and documentary evidence.  The court held that this evidence dispelled the inference of use as a matter of law and explained 'it follows from the absence of copying that plaintiff has no cause of action.'"  *Id.* (citing *Teich*, 170 Cal.App.2d at 796-800, 803-06, and *Mann v.*

*Columbia Pictures, Inc.*, 128 Cal.App.3d 628, 650 (1982) (evidence of the author's independent creation of the screenplay "Shampoo" rebutted plaintiff's inference of access to and use of her work)).

In *Hollywood Screentest*, plaintiff sued the defendant broadcaster for, *inter alia*, misappropriation of property and breach of an implied-in-fact contract arising from plaintiff's pitching of "Hollywood Screentest," "a reality show which would give ordinary people from all walks of life the chance to break into the close-knit Hollywood entertainment community," and defendant's subsequent production of a similar show, "Next Action Star." *Id.* at 633, 638. Applying *Teich*'s independent creation doctrine, the court concluded that plaintiff's causes of action failed as a matter of law because defendant's evidence of independent creation of "Next Action Star" barred a finding that it had used plaintiff's ideas. *Id.* at 648-49.

Applying the doctrine here, it is evident from the record that Morawski pitched *Guardians of Eden* to Cameron in 1991, several years before Cameron drafted the scriptment for *Avatar*. There are, moreover, similarities between the two projects. If Cameron is able to show, despite these similarities, that he independently created *Avatar* without using Morawski's ideas, he can defeat Morawski's breach of contract claim.

As evidence of independent creation, defendants submit Cameron's 45-page declaration, in which he calls *Avatar* his "most personal film."[47] Cameron asserts that "the very conceptual fabric of *Avatar*[ ] is innate to [him], based on a systematically developed pattern of artwork, story concepts, interests, and activities beginning in [his] elementary school days and stretching forward through high school, college, and [his] earliest career as a writer and filmmaker."[48]  In addition to professing a lifelong love of science and science fiction, Cameron asserts in his declaration that almost every aspect of *Avatar* was drawn from one of his prior works or from other well-known stories.  Upon reviewing Cameron's earlier works, it is evident that each element of *Avatar* that was allegedly taken from *Guardians of Eden* was independently created

---

[47]Cameron Decl., ¶ 139.

[48]*Id.*

13

by Cameron prior to his meetings with Morawski.   The court details Cameron's relevant prior work below.

### 2. Cameron's Prior Works

#### a.     *Xenogenesis*

█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
███████████████████████     ████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
████████   ███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████     █
████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
███████  █

#### b.     *Chrysalis*

Defendants assert that Cameron derived the disabled protagonist, Jake, not from *Guardians*

14

*of Eden*, but from *Chrysalis*, a collaboration between Cameron and Frakes in 1974.  In *Chrysalis*, a wheelchair-bound man elects to remove all external sensory input so that he can take a journey through his own mind.[49]  The character achieves freedom from his wheelchair while on his mental journey and eventually transcends his physical human form.[50]  Cameron asserts that this character was a direct predecessor of Jake in *Avatar*, who was freed from his wheelchair while mentally linked to his avatar and eventually abandoned his human form permanently.[51]

### c.  *Mother*

Defendants also assert that many of the purported similarities between *Avatar* and *Guardians of Eden* that Morawski identifies were derived from *Mother*, a 1980 Cameron project.[52]  In *Mother*, humans plunder Earth and seek to exploit another planet.[53]  A corporation, known as the Triworld Development Corporation, establishes mines on the other planet; humans cannot survive there unless they wear protective environmental suits.[54]  In addition to the mines, the corporation establishes research stations.[55]  These stations created "xenomorphs," genetically engineered alien creatures based on the planet's local life form.[56]  Trained controllers, one of whom is disabled, controlled the xenomorphs via "psychic link."[57]  Cameron asserts that he developed the disabled character to "illustrate and highlight the significance of the experience

---

[49]See generally Cameron Decl., Exh. 5 ("Chrysalis").

[50]*Id.*

[51]Cameron Decl., ¶ 18.

[52]MSJ at 12.

[53]See generally Cameron Decl., Exh. 18 ("Mother").

[54]*Id.*

[55]*Id.*

[56]*Id.*

[57]*Id.* at 192.

provided by this mental/technological link," a theme he also pursued through Jake in *Avatar*.[58] One of the research stations in *Mother* was run by a female scientist who was the controller of the xenomorph prototype; according to Cameron, this character is a direct predecessor of Grace in *Avatar*.[59]

### d.    *Wind Warriors*

Defendants contend that Cameron explored the themes of colonization and evil corporate interests in *Wind Warriors*, an unproduced work he drafted between 1985-1988.[60]   In *Wind Warriors*, an evil industrialist, with the aid of a mercenary army, seeks to exploit a valuable metal found in the Brazilian rainforest.[61]   The mercenaries battle indigenous warriors, who ingest the root of a plant that makes them invincible.[62]   Cameron asserts that several of the ideas he purportedly used from *Guardians of Eden* actually came from *Wind Warriors*, including a veteran as main character, a jungle setting, an evil mining corporation willing to destroy the jungle and its indigenous people, corporate mercenaries, and natives fighting a powerful military with primitive weapons.[63]

### e.    *Rambo II*

Defendants next assert that Cameron first developed several of the themes and ideas in *Avatar* when writing *Rambo II*, a draft script he wrote in 1983.[64]   In *Rambo II*, protagonist John Rambo ventures into the Vietnamese jungle to rescue a prisoner-of-war; he is aided by an

---

[58]Cameron Decl., ¶ 64.

[59]*Id.*, ¶ 65.

[60]MSJ at 13; Cameron Decl., ¶ 78.

[61]See generally Cameron Decl., Exh. 21 ("Wind Warriors").

[62]*Id.*

[63]Cameron Decl., ¶ 82.  Frakes testified in his deposition that Cameron discussed using elements of *Wind Warriors* in *Avatar* with him sometime in 1994.  (Reply Declaration of Elaine Kim, Docket No. 169 (Dec. 20, 2012), Exh. 64 at 20:7-20).

[64]MSJ at 13; Cameron Decl., ¶ 72

indigenous agent, a young Vietnamese native with whom Rambo eventually falls in love.[65] Rambo eventually fights with the indigenous Vietnamese people against technologically superior Russian forces.[66]   Cameron maintains that he drew on these earlier ideas from 1983 when he created *Avatar*.[67]   He also asserts that he conducted a significant amount of research regarding military aircraft when drafting *Rambo II*, and that he drew on that research to create the gun ships used by the antagonists in *Avatar*.[68]

### f.   Other Purported Antecedents to *Avatar*

Defendants also contend that several of the ideas and themes in *Avatar* come from history or themes commonly used in stories.   They assert, for example, that *Avatar* merely retells the story of European colonists' genocide against indigenous peoples, told through the lens of a "Romeo-and-Juliet love story" between people on opposing sides.[69]   Stated differently, defendants contend that *Avatar* "is the famous story of Pocahontas or *Dances with Wolves*."[70]   Cameron also states that Jake's character was inspired by Cameron's brother, who was a Marine during the Gulf

---

[65]See generally Cameron Decl., Exh. 20 ("Rambo II").

[66]*Id.*

[67]Cameron Decl., ¶ 72.   Cameron's testimony regarding his development of these themes in *Rambo II* is supported by Frakes, who avers in his declaration that "[s]omething that Cameron has been interested since the 1970s is the idea that seemingly weaker groups of people could band together as a collective to beat a superior force.   Both of us were children of the 1960s, and the Vietnam War and the popular movement against it had a profound effect on us, which we frequently talked about.   In the 1970s and early 1980s, one of the story ideas that Cameron discussed with me was a story about an American military man who bombs Vietnamese villages, but then falls in love with a Vietnamese girl and works together with the Vietnamese to fight against the U.S. military.   Cameron incorporated similar elements in his script for *Rambo II*, or *First Blood: Part II*, which I typed up for him."   (Frakes Decl., ¶ 13).

[68]Cameron Decl., ¶ 72.

[69]MSJ at 14.

[70]*Id.*

17

War.[71]  Defendants assert that, contrary to Morawski's claims, it is these stories and events, combined with Cameron's earlier works, that inspired him independently to create *Avatar*.

### 3.     Whether the Undisputed Evidence Demonstrates that Cameron Independently Created *Avatar*

Reviewing all the evidence adduced by the parties, the court concludes that Cameron has rebutted any inference that would otherwise arise that he used Morawski's ideas by demonstrating that he independently created the ideas he purportedly misappropriated.  Defendants have adduced evidence that the core characters, themes, and plot of *Avatar* are composites of earlier Cameron works or historical events.  Moreover, all of the alleged similarities identified by Morawski can be traced to  pre-pitch ideas Cameron developed independently or derived from well-known historical events. See *Green v. Schwarzenegger*, No. CV 93–5893–WMB, 1995 WL 874191, *14 (C.D. Cal. July 12, 1995) (granting summary judgment on a copyright infringement claim, in part because the alleged similarities "were present in Cameron's earlier motion pictures 'The Terminator' and 'The Abyss,' or were otherwise contemplated by Cameron prior to plaintiff's submission of his script to ICM").  By way of example, Cameron's documented pre-1991 ideas include a disabled protagonist transporting his consciousness to another form, evil mercenaries attempting to exploit resources in a jungle-like setting, a jungle containing bioluminescent plants and unusual animals, a protagonist fighting alongside natives against a superior fighting force, and a sentient planet.

Additionally, Cameron's *Avatar* notes expressly reference some of his earlier works as inspiration for the film. ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████      ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

---

[71]Cameron Decl., ¶ 112.

1 ████████████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████████████

3 █████████████████████████████████████████████████████████     See

4 *Green*, 1995 WL 874191, *14 (holding that references to a shape-changing character in

5 Cameron's notes for the original *Terminator* film showed that he independently created an

6 allegedly infringing shape-changing character in *Terminator II*).

7       Furthermore, there is no direct evidence that Cameron used Morawski's ideas rather than

8 his own. In lieu of such evidence, Morawski contends that the similarities between *Avatar* and

9 *Guardians of Eden*, and the fact that Cameron did not create *Avatar* until after he met with

10 Morawski, give rise to an inference of use.[72]  As noted, however, each of the alleged similarities

11 appears in an earlier work by Cameron.  "[W]here defendant owns a prior work containing the

12 same elements, he has no reason, beyond the illicit thrill of [misappropriation], to copy

13 wrongfully from another what he could legally copy from himself.  Therefore, where an element

14 occurs both in the defendant's prior work and the plaintiff's prior work, no inference of copying

15 can be drawn."  *Murray Hill Publications, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d

16 312, 326 (6th Cir. 2004).

17       In *Kightlinger v. White*, No. B210802, 2009 WL 4022193, (Cal. App. Nov. 23, 2009)

18 (Unpub. Disp.),[73] the court addressed a similar independent creation claim.  There, defendant

19 drafted a screenplay years after reading plaintiff's screenplay that allegedly misappropriated

20 plaintiff's ideas.  *Id*. at *1.  Defendant asserted an independent creation defense and submitted

21 a declaration detailing his independent creation of the allegedly unlawful screenplay; he submitted

22 pages of his compositional notebooks that detailed his creation process and the "gestation period"

23

24     [72]Opp. at 21.

25     [73]Although the court is not bound by unpublished decisions of intermediate state courts,

26 unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority."  *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05-313 VRW, 2005 WL 2893865,

27 *3 (N.D. Cal. Nov. 2, 2005) (citing *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even

28 though such opinions have no precedential value")).

of the project. *Id*. at *9. Defendant also submitted third-party declarations stating that events in his screenplay were based on events in his own life, and not plaintiff's screenplay. *Id*. The court held that this evidence was "'clear, positive, uncontradicted and of such a nature that it cannot rationally be disbelieved' and, therefore rebuts an inference of use." *Id* at *10 (quoting *Teich*, 170 Cal.App.2d at 799). The court held that each purportedly similar element in defendant's screenplay was "based on events in his life and not on ideas in plaintiff's screenplay." *Id*. It found the fact that defendant's script was written after he had access to plaintiff's screenplay was insufficient, by itself, to raise triable issues of fact regarding use, as plaintiff adduced no other evidence contradicting defendant's evidence of independent creation. *Id*.

Here, as in *Kightlinger*, defendants have adduced evidence that details Cameron's creative process and the sources of his ideas. Each of the alleged similarities between *Avatar* and *Guardians of Eden* can be traced to stories that Cameron created or discovered before Morawski pitched his movie in 1991. Cameron has proffered a detailed declaration describing his lifelong love of science and science fiction, and the process he used independently to create *Avatar*. As in *Kightlinger*, Cameron's notes detail his research and evolving thought process while creating *Avatar*. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ Additionally, defendants proffer the declaration of Cameron's writing partner, Frakes, who states that "the ideas of a paraplegic protagonist who is able to walk again in a journey through his mind, a sentient planet with a neural network of trees and bioluminescent plants, a scientist character who is interested in plant life, a love story between a military veteran and a girl on the other side of the conflict, seemingly more primitive or weaker people rising up against and prevailing over a superior force that seeks to exploit them . . . are all ideas that Cameron has had in his repertoire for a long time and which he discussed with me in the 1970s and 1980s."[74]

---

[74]Frakes Decl, ¶ 17.

Cameron's and Frakes' testimony is direct evidence that Cameron conceived of those aspects of *Avatar* that are allegedly similar to Morawski's ideas before he had access to Morawski's ideas.  See *Calhoun v. Lillenas Publishing*, 298 F.3d 1228, 1233 (11th Cir. 2002) ("McGee stated in his affidavit that he independently created 'Emmanuel' during [a] church service in May or June 1976. . . .  Moreover, McGee provided affidavits of several witnesses who corroborate his independent creation of 'Emmanuel' during a church service.  Calhoun did not offer any evidence to contradict McGee's testimony.  Therefore, the district court was correct in concluding that McGee's testimony constitutes uncontradicted evidence of independent creation, which fully negates any claim of infringement" (internal quotation marks omitted)).

Although Cameron did not combine the various elements and ideas in a single comprehensive story until after he met with Morawski, the timing of *Avatar*'s creation, in relation to Morawski's pitch, is not by itself sufficient to give rise to an inference of use.  See *Hollywood Screentest*, 151 Cal.App.4th at 648 (given defendant's uncontroverted evidence of independent creation, the "timing [of defendant's creation alone is] insufficient to create a disputed issue of fact" regarding defendants' use of plaintiff's idea); *Kightlinger*, 2009 WL 4022193 at *10 (concluding that independent creation can occur even after access to a plaintiff's ideas if there is sufficient evidence that defendant had independent sources for the allegedly similar concepts).

Additionally, despite the fact that he had not developed *Avatar* fully prior to 1991, Cameron's evidence of independent creation is in many ways stronger than that of the defendant in *Kightlinger*.  There, defendant relied primarily on testimonial evidence and declarations stating that his screenplay mirrored events in his life.  *Kightlinger*, 2009 WL 4022193 at *9-10.  By contrast here, defendants proffer, in addition to declarations, concrete documentary evidence, in the form of Cameron's prior works, that clearly demonstrates many of the characters, themes, and ideas contained in *Avatar* are derived from his past projects.  See *Sobhani v. @Radical.Media Inc.*, 257 F.Supp.2d 1234, 1237 (C.D. Cal. 2003) (stating that summary judgment may be appropriate if testimony of earlier creation "is corroborated by documentary proof").

Morawski counters that defendants have not shown independent creation because had Cameron independently created the ideas prior to Morawksi's pitch, he would have stopped the

pitch meeting and told Morawski that he already had an idea similar to *Guardians of Eden*. Speculation as to what Cameron would have done, however, is pure conjecture. "It is axiomatic that an inference may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guesswork." *Mann*, 128 Cal.App.3d at 648. Rather, Morawski must adduce "evidence that calls into question the evidence supporting independent creation." *Hollywood Screentest*, 151 Cal.App.4th at 648. Morawski has proffered no such evidence.

Morawski also argues that Cameron's earlier works are "nothing like" *Avatar*, and cannot form the basis of an independent creation defense.[75] Defendants do not argue that the earlier works are the exact story of *Avatar*, however; rather, they assert that Cameron drew on the elements, characters, themes, and ideas of his prior works to create *Avatar*.[76] Cameron and Frakes both state this in their declarations;[77] the substantial similarities between the characters, themes, and ideas in Cameron's earlier works and *Avatar*, moreover, support their testimony, as do Cameron's express citations in his *Avatar* notes to the earlier works. The fact that none of Cameron's earlier works exactly duplicates the story of *Avatar* does not defeat his claim that he used the prior works as inspiration for *Avatar*, and did not copy the ideas embodied in *Guardians of Eden* that Morawski pitched in 1991. See, e.g., *John L. Perry Studio, Inc. v. Wernick*, 597 F.2d 1308, 1310 n. 2 (9th Cir. 1979) (affirming the district court's determination that allegedly infringing bird sculptures were independently created, in part because "[t]he accused bird shows characteristics similar to other birds created earlier by Williams, thus suggesting a 'common heritage'"); *Nicholls v. Tufenkian Import/Export Ventures, Inc.*, 367 F.Supp.2d 514, 525 (S.D.N.Y. 2005) (concluding, based on examples of defendant's earlier carpet designs and testimony regarding "the evolution of [defendant's] thinking," that defendant had shown independent creation, despite the fact that prior designs were not identical to the allegedly

---

[75]Opp. at 22.

[76]Reply at 5.

[77]See generally Cameron Decl.; Frakes Decl., ¶ 17.

22

infringing design); *Hogan v. DC Comics*, 48 F.Supp.2d 298, 314 (S.D.N.Y. 1999) (finding that defendant independently created the idea for a comic book, based on "excerpts from a novel [defendant] authored prior to [hearing plaintiff's idea]," and that the novel "served as the inspiration" for the main character in the allegedly infringing comic); *Scholastic Inc. v. Speirs*, 28 F.Supp.2d 862, 869 (S.D.N.Y. 1998) (holding, based on defendant's drawings made prior to gaining access to plaintiff's work, that defendant independently created an allegedly infringing skeleton character, even though the initial drawing was not the same as the allegedly infringing drawing, because defendant also submitted "a paper trail of contemporaneous memos and sketches relating to the development of the allegedly infringing" character).

In *Kightlinger*, defendant's independently created work was not an exact retelling of his life story; rather, the court stated, "his life served as *the source for . . . material elements*" of his screenplay. 2009 WL 4022193 at *10 (emphasis added). The court compared events in defendant's screenplay with events in his own life, and determined that allowing plaintiff's claim to proceed would lead to the illogical conclusion that "defendant would be barred from writing about these significant events in his own life." *Id.* The same logic applies to defendants' argument here, even though Cameron states that his earlier works, rather than his life experience, were the source of material elements of *Avatar*. Cameron has adduced clear documentary evidence of his earlier ideas, clear citations to the works in his notes for *Avatar*, and Frakes' corroborating testimony. While Cameron has not demonstrated that he developed the full, comprehensive story of *Avatar* prior to meeting with Morawski, this does not preclude a finding that he independently created the story by drawing on his earlier creations.

Morawski disputed this at the hearing, arguing that even if Cameron derived individual characters or ideas used in *Avatar* from his earlier works, he did not develop the ultimate story until after he had heard Morawski's pitch. Morawski asserted that *Guardians of Eden* served as the "vehicle" that Cameron utilized to bring concepts he had earlier created to the screen. This argument is unavailing. First, as noted, other courts have considered individual components of a defendant's prior works and found them to be persuasive evidence of independent creation, even if the later work is a different story. See *Green,* 1995 WL 874191 at *14 (granting summary

judgment on a copyright infringement claim in part because the allegedly similar characters "were present in Cameron's earlier motion pictures 'The Terminator' and 'The Abyss,' or were otherwise contemplated by Cameron prior to plaintiff's submission of his script to ICM"); *Kimbell v. Rock*, No. CV 09-7249 DSF, 2009 WL 3248208, *3 (C.D. Cal. Oct. 8, 2009) (holding in a copyright infringement case that the court must "filter[ ] out the elements of [the allegedly infringing work] that existed before access"); see also *Murray Hill Publications*, 361 F.3d at 326 ("[W]here defendant owns a prior work containing *the same elements*, he has no reason, beyond the illicit thrill of [misappropriation], to copy wrongfully from another what he could legally copy from himself.  Therefore, where an element occurs both in the defendant's prior work and the plaintiff's prior work, no inference of copying can be drawn" (emphasis added)).

Additionally, it is clear that Cameron used more than just isolated characters and concepts from his earlier works.  He incorporated entire themes and story arcs from prior works in his *Avatar* scriptment.  Cameron does not cite *Mother*, for example, simply as evidence that he previously had the idea of featuring a wheelchair-bound protagonist in a film.  He argues instead that *Mother* reflects the fact that he earlier conceived the idea of a disabled protagonist able to transcend his physical form by psychically inhabiting the body of a synthetic alien creature.[78] Jake's disability and his transcendence of the human form are not isolated components of *Avatar*; they are core features of the story and are clearly derived from Cameron's earlier works. Similarly, Cameron does not reference *Wind Warriors* merely to show that he earlier conceived the idea of featuring an evil corporation as an antagonist.  Instead, he cites it as proof that he independently created the story of a military veteran, fighting in a jungle together with native inhabitants, against an evil mining corporation willing to destroy the jungle and its indigenous people.[79]  This same struggle between natives and an evil mining corporation formed the central conflict in *Avatar*.

Finally, even if Cameron's prior works served only as the inspiration for isolated ideas or

---

[78]See generally Mother; Cameron Decl., ¶ 64.

[79]See generally Wind Warriors; Cameron Decl., ¶ 82.

24

characters, and not for the full narrative of *Avatar*, there is no evidence that Cameron derived *Avatar*'s story line from *Guardians of Eden*.  Defendants proffer uncontroverted evidence that Cameron based the *Avatar* narrative on the history of European colonization and the story of Pocahontas.  Cameron asserts in his declaration that the "European destruction of native peoples, using military force, in order to acquire their land and resources, is the obvious basis for the *Avatar* story."[80]

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████  Cameron contends that the story of primitive natives battling colonists with superior technology is "well known to all of us," and that the fact that the story of *Avatar* is derived from the story of European colonization is "deliberate and obvious . . . . It's not meant to be subtle."[81]

In addition to referencing the history of European colonization, Cameron also states that he based the *Avatar* narrative on the story of Pocahontas, which "has been famous for four centuries."[82]  He contends *Avatar* is clearly modeled on the story of Pocahontas, as each tale involves "[a] white outsider [who] falls in love with the chief's daughter, who becomes his guide to the tribe and to their special bond with nature."[83] ██████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[80]Cameron Decl., ¶ 93.

[81]*Id.*, ¶¶ 93-94.

[82]*Id.*, ¶ 107

[83]*Id.*

1 ██████████████████████████████████████████████████████████████

2 ███████████████████████████   ████████████████████████████████

3 ██████████████████████████████████████████████████████████████

4 ████████████████████████

Ultimately, it is clear upon reviewing Cameron's notes and testimony that *Guardians of Eden* was not the "vehicle" he utilized in developing the story of *Avatar*; *Avatar* is simply a re-telling of the familiar story of European colonization and the love story between Pocahontas and John Smith.  It is the story of indigenous people fighting for their home against a stronger, encroaching enemy, and of an unlikely romance between two people on opposing sides.  These ideas form the basis for countless works dating back centuries.[84]

As California courts have noted, "there are a limited number of ideas and themes available for use in literary material, and, therefore, those ideas and themes are shared by all literature." *Klekas v. EMI Films, Inc.*, 150 Cal.App.3d 1102, 1113 (1984).  See also *Desny v. Wilder*, 46 Cal.2d 715, 741 (1956) ("It has been said (and does not appear to have been successfully challenged) that 'There are only thirty-six fundamental dramatic situations, various facets of which form the basis of all human drama.' . . .  It is manifest that authors must work with and from ideas or themes which basically are in the public domain").  Based on his notes and testimony, it is clear that Cameron built *Avatar* around common, frequently-utilized plot lines, and incorporated characters, themes, and ideas he had previously created to produce an original version of these well-known stories.

Consequently, the court concludes that clear, undisputed evidence shows Cameron independently created *Avatar* and did not use Morawski's ideas.  As a result, Morawski's claim for breach of express contract fails as a matter of law, and the court grants defendants' motion

---

[84]Defendants reference *Romeo and Juliet*, *Dances With Wolves*, *The Mission*, and *Ferngully* as just a few of the stories containing the same themes and/or narrative arc.

1    for summary judgment on that claim.[85]

2    **C.    Whether Defendants Are Entitled to Summary Judgment on Morawski's**

3    **Breach of Implied-in-Fact Contract Claim**

4    Defendants also move for summary judgment on Morawski's breach of implied-in-fact

5    contract claim.    To prevail on a claim for breach of an implied-in-fact contract based on

6    Morawski's submission of his story to defendants, Morawski must establish that: "(1) [he]

7    submitted the [story] for sale to [d]efendants; (2) [he] conditioned the use of the [story] on

8    payment; (3) [d]efendants knew or should have known of the condition; (4) [d]efendants

9    voluntarily accepted the [story]; (5) [d]efendants actually used the [story]; and (6) the [story] had

10   value." *Benay v. Warner Bros. Entertainment, Inc.*, 607 F.3d 620, 630 (9th Cir. 2010).

11   Morawksi's implied-in-fact contract claim fails for two independent reasons.    First, a

12   necessary element of establishing such a claim is that defendants actually used his ideas.    See

13   *Kightlinger*, 2009 WL 4022193 at *2 (to succeed on an implied-in-fact contract claim, a plaintiff

14   must demonstrate that, "believing the idea was valuable, *defendant used it*" (emphasis added)).

15   As discussed, a showing of independent creation rebuts an inference that defendants used the ideas

16   submitted by plaintiff.    See *Hollywood Screentest*, 151 Cal.App.4th at 649 ("Appellants' cause

17   of action for an implied-in-fact contract for payment in exchange for the use of ideas necessarily

18   requires a finding that NBC actually used appellants' ideas.    As discussed above, that element is

19   negated by the uncontradicted evidence of the independent creation of Next Action Star.

20   Therefore, the cause of action for breach of implied-in-fact contract and the related causes of

21   action for equitable awards fail as a matter of law").    Because defendants have adduced

22   undisputed evidence that Cameron independently created *Avatar*, Morawski cannot show that

23   defendants used his ideas and his implied-in-fact contract claim fails.

24   Second, "an action based on an implied-in-fact or quasi-contract cannot lie where there

25   exists between the parties a valid express contract covering the same subject matter." *Lance*

26

27   [85]Because the court finds that Cameron did not use Morawski's ideas, it need not address
     defendants' remaining arguments that Morawski's ideas were not "original," and thus that use of

28   his ideas did not breach the Agreement.

1  *Camper Mf'g. Corp. v. Republic Indem. Co. of Am.*, 44 Cal.App.4th 194, 203 (1996); see also

2  *Wall-Noon Corp. v. Hill*, 45 Cal.App.3d 605, 613 (1975) ("There cannot be a valid, express

3  contract and an implied contract, each embracing the same subject matter, existing at the same

4  time.  The reason for the rule is simply that where the parties have freely, fairly and voluntarily

5  bargained for certain benefits in exchange for undertaking certain obligations, it would be

6  inequitable to imply a different liability and to withdraw from one party benefits for which he has

7  bargained and to which he is entitled").   Neither party disputes the validity of the express

8  contract between them or contends that it does not cover the subject of defendants' use of

9  Morawksi's ideas.  Consequently, Morawski cannot recover on an implied-in-fact contract theory.

10  Defendants' motion for summary judgment as to Morawski's breach of an implied-in-fact contract

11  is therefore granted.

12       **D.    Whether Defendants Are Entitled to Summary Judgment on Morawski's Fraud**

13              **and Negligent Misrepresentation Claims**

14       Finally, defendants assert that they are entitled to summary judgment on Morawski's fraud

15  and negligent misrepresentation claims.[86]   Each of these claims is based on allegations that

16  defendants did not intend to perform their promised obligations under the Agreement, and thus

17  misrepresented that they would not use Morawski's ideas without compensating him.[87]

18       To prevail on a fraud claim, plaintiff must demonstrate: "(a) misrepresentation (false

19  representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent

20  to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Neilson*

21  *v. Union Bank of California, N.A.*, 290 F.Supp.2d 1101, 1140-41 (C.D. Cal. 2003) (quoting

22  *Engalla v. Permanente Medical Group, Inc.*, 15 Cal.4th 951, 974 (1997)).

23       "The elements of a cause of action for negligent misrepresentation are the same as those

24

25

26  [86]Morawski asserts separate claims for intentional and negligent misrepresentation against
    Cameron and Lightstorm; the claims against each defendant, however, are substantially identical,

27  and the court therefore resolves them together.

28  [87]FAC, ¶¶ 53-86

of a claim for fraud [or intentional misrepresentation], with the exception that the defendant need not actually know the representation is false." *Id.* (citing *B.L.M. v. Sabo & Deitsch*, 55 Cal.App.4th 823, 834 (1997)); *see also Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1201 n. 2 (9th Cir. 2001) ("The elements of negligent misrepresentation include: (1) misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the misrepresentation, (4) ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed, and (5) resulting damage"); *Firoozye v. Earthlink Network*, 153 F.Supp.2d 1115, 1128 (N.D. Cal. 2001) ("The elements for a claim for negligent misrepresentation are similar [to the elements for fraud]; the plaintiff must show that the defendant made a misrepresentation without reasonable grounds for believing it to be true and that the representation was intended to induce the plaintiff to take some action in reliance upon it").

As a threshold matter, the court notes that under California law, "an action for negligent misrepresentation cannot be founded upon a false promise." *Dielsi v. Falk*, 916 F.Supp. 985, 995 n. 13 (C.D. Cal. 1996); *see also Color Match Pool Fittings, Inc. v. Aquastar Pool Products, Inc.*, No. CV 06-781-GW(PLAx), 2007 WL 5193737, *3 (C.D. Cal. Aug. 10, 2007) ("While it is true that California permits claims for negligent misrepresentation in general, it does not recognize the more specific type of negligent misrepresentation that involves a negligent false promise"); *Klein v. Dominos Pizza Inc.*, 66 F.3d 335, 1995 WL 520052, *3 (9th Cir. Sept. 1, 1995) (Unpub. Disp.) ("Claims based on future or promised acts are false promise claims. Therefore, Klein's negligent misrepresentation claim is actually a claim for a negligent false promise. The negligent false promise claim is explicitly barred as a matter of law" (internal citations omitted)); *Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal.App.4th 153, 159 (1991) ("Simply put, making a promise with an honest but unreasonable intent to perform is wholly different from making one with no intent to perform and, therefore, does not constitute a false promise. Moreover, we decline to establish a new type of actionable deceit: the negligent false promise"). As noted, Morawski's negligent misrepresentation claims are predicated solely on an allegation that defendants negligently "misrepresented a material fact by promising they would not use

Morawski's original ideas."[88]  Accordingly, Morawski's negligent misrepresentation claims are in reality negligent false promise claims that are not cognizable under California law.  The court therefore grants defendants' motion for summary judgment on these causes of action.[89]

Morawski's intentional misrepresentation claims are also based on allegations of promissory fraud.  To prove a promissory fraud claim, a plaintiff must prove that defendants made a promise without any intention of performing it, intent to induce reliance, justifiable reliance, and resulting damages. *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996).  "[I]n order to support a claim of fraud based upon the alleged failure to perform a promise, it must be shown that the promisor did not intend to perform *at the time the promise was made.*" *Conrad v. Bank of America*, 45 Cal.App.4th 133, 157 (1996) (emphasis added).  "[S]omething more than nonperformance is required to prove the defendant's intent not to perform his promise." *Tenzer v. Superscope, Inc.*, 39 Cal.3d 18, 30 (1985); see also *Fanucchi & Limi Farms v. United Agri Products.*, 414 F.3d 1075, 1089 (9th Cir. 2005) ("Affirmative evidence is necessary to avoid summary judgment because mere nonperformance is not enough to show intent to defraud"); *Morris v. Atchity*, No. CV 08-5321 RSWL (JCx), 2010 WL 4181452, *5 (C.D. Cal. Oct. 15, 2010) ("[M]ere nonperformance of a promise is insufficient to show intent to defraud;" rather, a plaintiff must adduce "affirmative evidence of [this intent]").

Morawski has adduced no evidence that defendants did not intend to perform their obligations under the contract at the time it was executed.  Indeed, even if non-performance of a promise were sufficient to demonstrate fraudulent intent, the undisputed evidence shows that defendants independently created *Avatar*.  It thus establishes that defendants did not use Morawski's ideas and did not fail to perform under the Agreement.  See *Levitan v. Apple Computer, Inc.*, No. H024191, 2003 WL 1914274, *8 (Cal. App. Apr. 18, 2003) (Unpub. Disp.) (stating that one element of a promissory fraud claim is "failure of performance by the promisor").  As defendants note, moreover, at the time the contract was signed and the promise

---

[88]FAC, ¶¶ 73, 81.

[89]Morawski does not argue otherwise, as he failed to address this issue in his opposition.

made, they did not know what idea or ideas Morawski would pitch.  They thus could not have known that they wanted to use the ideas and have entered into an Agreement not to do so with no intention of performing.

Morawski asserts that defendants' intent can be inferred from Cameron's statement that he wanted to offer Morawski a deal for *Guardians of Eden*, and that, after Morawski asked for $24,000 to write the script, Lightstorm advised that it could not pay him that much to write the script.  He cites no authority supporting the contention that this fact alone gives rise to an inference of intent to defraud.  Indeed, his logic is flawed, since the promise defendants allegedly did not perform was a promise that Morawski would continue to own all of his original ideas and artwork, and that Lightstorm would negotiate with him if it wished to acquire them.  What followed Cameron's statement that he wanted to offer Morawski a deal was effectively a negotiation – Morawski offered to write a script for $24,000, and Lightstorm told him it would not pay that much.

Other cases finding an inference of intent to defraud have relied on much stronger circumstantial evidence.  In *Tenzer*, for example, the court stated that intent not to perform "has been inferred from such circumstances as defendant's insolvency, his hasty repudiation of the promise, his failure even to attempt performance, or his continued assurances after it was clear he would not perform."  *Id*. at 30-31.  Here, no comparable circumstances exist; the fact that defendants did not use Morawski's ideas without compensating him is strong circumstantial evidence that they did not enter into the Agreement with fraudulent intent.  Because Morawski has failed to adduced direct or circumstantial evidence that defendants did not intend to perform their obligations under the Agreement, his intentional misrepresentation claims fail as a matter of law.

Finally, even if Morawski had adduced sufficient circumstantial evidence to raise triable issues of fact concerning defendants' fraudulent intent, he has proffered no evidence that he suffered damages as a result of the alleged misrepresentation.  "Deception without resulting loss is not actionable fraud."  *Service by Medallion, Inc. v. Clorox Co.*, 44 Cal.App.4th 1807, 1818 (1996).  Morawski argues that he was injured because "he would not have disclosed [*Guardians*

31

*of Eden*] to [d]efendants absent their false promise."[90]  He identifies no damage flowing from his disclosure, however.  First, Morawski adduces no evidence that he had to forego other offers to develop his film due to the Agreement with defendants, or that he refrained from seeking other partners to make the film.  In fact, there is evidence that, subsequent to execution of the Agreement, Morawski submitted *Guardians of Eden* to at least one other filmmaker, who also declined to produce the movie.[91]  It therefore appears that Morawski's disclosure of *Guardians of Eden* to defendants did not prevent him from pursuing other avenues of making the film made and thus did not result in damages.

　　　　More fundamentally, because the undisputed evidence demonstrates that Cameron independently created *Avatar* and did not breach the Agreement, Morawski cannot demonstrate that he suffered damage as the result of misappropriation of his ideas or that he incurred costs in reliance on defendants' promise.  See *Service by Medallion*, 44 Cal.App.4th at 1818 (concluding that plaintiff failed to demonstrate damage resulting from promissory fraud because "the parties apparently performed their contractual promises," and therefore "even if Clorox falsely promised to take steps to ensure continued performance during a union campaign, Medallion's reliance on that promise by entering into the contract and preparing to perform did not constitute 'detriment proximately caused' by Clorox's conduct").  Even if defendants did not intend to uphold their promise at the time it was made, they ultimately did fulfill their obligations under the Agreement.  As a result, Morawski cannot adduce evidence that he suffered harm as a result of the alleged fraud.

　　　　For all of these reasons, the court grants defendants' motion for summary judgment on Morawski's fraud and negligent misrepresentation claims.

---

[90]Opp. at 25.

[91]SUF, ¶¶ 207, 209; SGI ¶¶ 207, 209

1

2

**III.  CONCLUSION**

For the reasons stated, defendants' motion for summary judgment is granted.

DATED: January 31, 2013

MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

33